EXXON CORPORATION, Petitioner,

v.

Russell E. TRAIN and Jack E. Ravan, Respondents.

Nos. 76–1561 and 76–1697.

United States Court of Appeals, Fifth Circuit.

June 27, 1977.

---

Elliotte M. Harold, Jr., H. H. Hillyer, Jr., Joseph E. LeBlanc, Jr., Bernard J. Caillouet, New Orleans, La., for petitioner in both cases.

Russell E. Train, Adm., EPA, Washington, D. C., Jack E. Ravan, Reg. Adm., EPA, Atlanta, Ga., Peter R. Taft, Asst. Atty. Gen., Alfred T. Ghiorzi, Pol. Con. Sect., Lloyd S. Guerci, Land & Natural Resources Div., Dept. of Justice, Washington, D. C., for respondents in both cases.

Before MORGAN and RONEY, Circuit Judges, and KING, District Judge.*

LEWIS R. MORGAN, Circuit Judge:

This case presents the question whether the Environmental Protection Agency

* District Judge of the Southern District of Florida sitting by designation.

**1312**

(EPA) has authority under the Federal Water Pollution Control Act Amendments of 1972 ("the Act" or "the 1972 Amendments"), Pub.L. 92–500, 86 Stat. 816 et seq., 33 U.S.C. § 1251 et seq., to control the disposal of wastes into deep wells under certain circumstances. EPA does not argue that the 1972 Amendments grant it plenary authority to control groundwater pollution.[1] It argues only that, as an incident to its power to issue permits authorizing the discharge of pollutants into surface waters, it has the power to place conditions in such permits that limit the "associated" disposal of wastes into wells. We, however, are convinced that Congress did not grant EPA that power.

## I. A BRIEF REVIEW OF THE 1972 AMENDMENTS.

As has been rehearsed in detail elsewhere, see generally E. I. duPont de Nemours & Co. v. Train, —— U.S. ——, —— ——, 97 S.Ct. 965, 968–973, 51 L.Ed.2d 204, 210–15 (1977); EPA v. State Water Resources Control Board, 426 U.S. 200, 202–209, 96 S.Ct. 2022, 2023–2027, 48 L.Ed.2d 578, 582–86 (1976), Congress enacted the 1972 Amendments with the declaration that, "it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985." § 101(a)(1).[2] § 301(a) of the Act provides that, except as in compliance with enumerated sections of the Act, "the discharge of any pollutant by any person shall be unlawful." § 301(b) directs the Administrator of

EPA to develop and promulgate "effluent limitations" setting forth restrictions on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which may be discharged from existing point sources. These effluent limitations are to reflect the best practicable control technology currently available by July 1, 1977, § 301(b)(1)(A), and the best available technology by July 1, 1983, § 301(b)(2)(A).

These effluent limitations are transformed into obligations on individual dischargers by means of the National Pollutant Discharge Elimination System (NPDES). See EPA v. State Water Resources Control Board, supra, 426 U.S. at 203–06, 96 S.Ct. at 2024–2025, 48 L.Ed.2d at 583–84. § 402(a) authorizes the Administrator to issue permits (which have come to be called "NPDES permits") authorizing the discharge of pollutants if the discharge will meet the applicable effluent limitations.[3] § 402(b) states that the Administrator "shall" transfer the permit-issuing function to a state if he determines that the state permit program will meet certain prerequisites. Compliance by a discharger with a NPDES permit is deemed to be compliance with, inter alia, § 301(a). § 402(k). The basic scheme of the Act, then, is to prohibit the discharge of pollutants (§ 301(a)) unless the discharge is authorized by a NPDES permit issued by the Administrator (§ 402(a)) or a state (§ 402(b)) that incorporates generally appli-

1. Throughout this opinion we will use certain terms interchangeably that are not, strictly speaking, equivalent. The main example is our equation of "disposal into deep wells" with "disposal into groundwaters," "subsurface waters," or "underground waters." We make this equation because neither party before us argues that the disposal at issue here, see Part II infra, is disposal into anything other than groundwaters. Specifically, EPA has not argued that the wastes disposed of into wells here do, or might, "migrate" from groundwaters back into surface waters that concededly are within its regulatory jurisdiction. Cf. Comment, Groundwater Pollution in the Western States—Private Remedies and Federal and State Legislation, 8 Land & Water L.Rev. 537, 557 (1973). We mean to express

no opinion on what the result would be if that were the state of facts.

2. Unless we note otherwise, all citations are to the Federal Water Pollution Control Act Amendments of 1972, Pub.L. 92–500, 86 Stat. 816 et seq.

3. Other portions of the Act require the Administrator to set standards, analogous to effluent limitations, for discharges from sources other than existing point sources and for special kinds of discharges. See, e. g., § 306 (standards for new point sources); § 307 (toxic and pretreatment standards). These standards, too, are transformed into limitations on individual dischargers through § 402.

cable limitations on the amount and character of pollutants discharged (§ 301(b)).

## II. FACTS AND AGENCY PROCEEDINGS.

Exxon Corporation, petitioner here, operates a natural gas production facility near Flomaton, Alabama. At this facility natural gas and gas condensate from nearby fields are separated from the other substances with which they are found in nature, primarily hydrogen sulphide, carbon dioxide, and brine (produced water). In the separation process, waste water (including brine, cooling tower purge water, and boiler blowdown water) is produced.

In designing the Flomaton facility, Exxon initially planned to dispose of this waste water by discharging part of it into surface holding pits from which it eventually would enter the Escambia River system, and by injecting the remainder into a formerly producing oil well about 5000 feet deep. Exxon applied to the appropriate Alabama authorities for permission to make the surface and well discharges.[4] After obtaining the required state certification, Exxon also applied to the Army Corps of Engineers for the certification then required from that agency for surface discharges.

While this latter application was pending, Congress enacted the 1972 Amendments, which transferred jurisdiction over Exxon's application from the Corps of Engineers to EPA. § 402(a)(5). Exxon submitted a revised application to EPA for a NPDES permit under the new Act.[5] Both the original and the revised applications were on Corps of Engineers forms headed, "Application for Permit to Discharge or Work in Navigable Waters and their Tributaries." Item 15 on both forms calls for the applicant to "[l]ist [the] volume of discharges or losses other than into navigable waters" and is followed by a list of the possible types of such discharges. On both forms, Exxon entered a figure next to the blank in this list for "underground disposal" indicating the expected volume of underground disposal from the Flomaton facility.

On February 25, 1974 the Regional Administrator for EPA Region IV issued Permit No. AL 0002445 to Exxon, authorizing "discharge from a facility located at FLOMATON, ALABAMA to receiving waters named AN UNNAMED TRIBUTARY TO HALL CREEK in accordance with effluent limitations, monitoring requirements and other conditions set forth" in other parts of the permit. Nothing in the permit purports either to authorize or to limit underground disposal.

After the Flomaton facility had been in operation for some time, Exxon found that excessive corrosion was occurring in the cooling water system. It determined that the addition of 30 parts per million of chromate to the cooling water would inhibit this corrosion. In addition, anticipating increased discharge volumes, Exxon proposed to begin using a second formerly producing well for disposal of waste water.[6] Exxon applied to the appropriate Alabama authority for permission to inject the chromate-bearing water into the first well and to begin operating the second disposal well. State authority to make these changes was granted.[7]

---

**4.** The Alabama Water Improvement Commission regulates discharges into surface waters. Ala.Code tit. 22, §§ 140(12a)–(12g). The Alabama Oil and Gas Board regulates disposal into nonproducing wells. Ala.Code tit. 26, §§ 179(24)–(55).

**5.** Exxon applied to EPA because EPA had not yet approved a state § 402(b) permit program; hence, the Administrator was performing the permit-issuing function under § 402(a). So far as we have been told, the Administrator still has not yet approved transfer of the permit-issuing function to the state of Alabama. There is nothing in the record before us as to the status of any efforts by the state to win approval of such a program.

**6.** Exxon intended that, when the second disposal well went into operation, discharges into surface waters from the Flomaton facility would cease altogether.

**7.** The Alabama Oil and Gas Board issued its certification for the well disposal after public notice and hearing and upon a finding:

That proposed injection intervals described above are below all fresh water-bearing zones and the injection proposed by petition-

At the same time, Exxon thought it appropriate to notify EPA Region IV of the changes in operation of the Flomaton facility. It did so in a letter dated January 22, 1975 that outlined the current and planned use of the disposal wells.

Five months later, by letter dated May 19, 1975, the Chief of the Water Enforcement Branch of the Enforcement Division of EPA Region IV replied to Exxon's letter by requesting further information about the operation of the disposal wells. The letter also expressed "curios[ity] as to why these disposal wells were not reported on the NPDES permit application prior to issuance of the permit," even though Exxon had completed the only apparently appropriate blank for well disposal on the NPDES application accepted by EPA.

Exxon answered this request by a letter dated August 15, 1975, which supplied technical information and analysis of the well disposal operation to EPA. On September 16, 1975 Exxon employees met with a group of EPA Region IV officials to review the Flomaton waste water disposal system. At this meeting the EPA officials asked Exxon what its position would be if EPA asserted jurisdiction over Exxon's subsurface disposal of waste water under the 1972 Amendments.

Exxon replied to this request by a letter dated October 28, 1975. In this letter Exxon stated its position that EPA did not have jurisdiction under the 1972 Amendments to regulate subsurface disposal, citing the recent case of *United States v. GAF Corp.*, 389 F.Supp. 1379 (S.D.Tex.1975). *See* note 17 *infra.* At the same time, while reserving the right to contest the jurisdictional issue, Exxon requested modification of its NPDES permit to authorize subsurface disposal.

The Regional Administrator for Region IV replied by letter dated December 3, 1975. This letter stated that on the basis of the information already submitted by Exxon, "we have determined that your request to discharge plant wastewater to deep wells should be denied." [8] The Regional Administrator also stated that it was EPA's position that it did have jurisdiction to regulate subsurface disposal "in certain instances," referring to a decision on a matter of law rendered by the General Counsel of EPA pursuant to 40 C.F.R. § 125.36(m), *see* note 21 *infra*, to 40 C.F.R. § 125.26, *see* note 20 *infra*, and to §§ 301(a), 402, and 502(12) of the Act. The letter concluded by stating, "Based upon our decision to deny your request for subsurface disposal, you will be expected to continue discharging the plant wastewaters as per the NPDES permit and to comply with the terms and conditions thereof."

---

er in the subject well, recompleted as described above, will dispose of injected substances efficiently into existing salt water-bearing zones without damage to any fresh water-bearing formations or any hydrocarbon-bearing formations. The proposed disposition will be in the interest of avoiding surface pollution.
State Oil and Gas Board of Alabama, Order No. 74–27.

**8.** The letter states that the denial was "based on the policy of EPA as established in Administrator's Decision Statement No. 5 (ADS No. 5) (30 Fed.Reg. 12922—April 9, 1975)." ADS No. 5, entitled, "EPA Policy on Subsurface Emplacement of Fluids by Well Injection," states in part:

*Policy and program guidance.* To ensure accomplishment of the subsurface protection goals established above it is the policy of the Environmental Protection Agency that:
   (1) The EPA will oppose emplacement of materials by subsurface injection without strict controls and a clear demonstration

that such emplacement will not interfere with present or potential use of the subsurface environment, contaminate ground water resources or otherwise damage the environment.
   (2) All proposals for subsurface injection should be critically evaluated to determine that:
   (a) All reasonable alternative measures have been explored and found less satisfactory in terms of environmental protection;

. . .

By its terms, this policy is to be applied "to the extent of [EPA's] authorities." The only explanation of how this policy was applied in denying Exxon's request for permit modification is the December 3 letter's statement that, "based upon this policy and the information supplied by your company, we cannot be assured that of the alternative measures explored that disposal of the plant wastewaters in deep wells will afford the greatest environmental protection."

By letter dated December 19, 1975 Exxon submitted a request to EPA Region IV for a legal decision regarding EPA's jurisdiction over subsurface disposal and for an adjudicatory hearing on the denial of permit modification, pursuant to 40 C.F.R. § 125.36. EPA acknowledged receipt of the requests on December 29, 1975, but it did not act on them. As the 90 days within which Exxon believed it was required to petition this court for review of the denial of permit modification was about to run, *see* § 509(b), EPA Region IV still had not acted on the requests. Rather than lose its right to review, Exxon petitioned this court on March 1, 1976 for review of EPA's claim of jurisdiction and of its denial of permit modification.

Two days later EPA finally acted on Exxon's requests for a legal decision and an adjudicatory hearing. By letter dated March 3, 1976 EPA Region IV denied both requests for the reasons stated in EPA's letter to Exxon dated December 3, 1975. The letter concluded, "Please be advised that denial of your Adjudicatory Hearing request constitutes final EPA action in this matter." Exxon promptly filed a second petition for review in this court, this one seeking review of EPA's denial of an adjudicatory hearing.

This is where matters stood until June 11, 1976. At that time EPA Region IV, without notice to Exxon and without any explanation, wrote Exxon to tell it that EPA had decided to grant an adjudicatory hearing after all. On June 21, 1976 EPA moved this court to dismiss Exxon's petitions, arguing, in view of the belated grant of an

adjudicatory hearing, that its action was not sufficiently final, or the cause not sufficiently ripe, to warrant review. Exxon resisted the motion. After briefing by both sides, we denied EPA's motion to dismiss by order dated August 4, 1976. In the meantime, we stayed EPA from taking any further action with regard to Exxon's subsurface disposal operation.[9]

### III. FINALITY AND RIPENESS.

We are met at the outset with a renewal of EPA's argument that we should not consider Exxon's challenge to its jurisdiction over deep-well disposal at this time because EPA now has granted an adjudicatory hearing to reconsider whether Exxon's NPDES permit should be modified to authorize deep-well disposal. EPA argues alternatively that its grant of an adjudicatory hearing deprives its earlier action of the finality required for judicial review; that its earlier action was never final; and that the issue of its jurisdiction is not ripe for review. In the circumstances of this case, we cannot agree.

■ As to the first branch of its finality argument, it is important to note what EPA does *not* argue. It does not argue that this court's jurisdiction was not properly invoked under § 509(b) on March 1, when Exxon filed its first petition for review.[10] At that time, it will be recalled, EPA already had asserted jurisdiction over Exxon's deep-well disposal operation and had denied Exxon's request for permit modification. And at that time EPA also had failed

---

**9.** In its brief on the merits EPA informs us, for the first time, that on April 19, 1976 it issued what purported to be an interim modification of Exxon's NPDES permit, authorizing Exxon to place limited amounts and kinds of waste into the Flomaton wells. Brief for Respondents at 11, 37 (Addendum C).

**10.** § 509(b) provides:
(1) Review of the Administrator's action . . . (F) in issuing or denying any permit under section 402, may be had by any interested person in the Circuit Court of Appeals for the Federal judicial district in which such person resides or transacts such business upon application by such person. Any such

application shall be made within ninety days from the date of such . . . issuance or denial, or after such date only if such application is based solely on grounds which arose after such ninetieth day.
(2) Action of the Administrator with respect to which review could have been obtained under paragraph (1) of this subsection shall not be subject to judicial review in any civil or criminal proceeding for enforcement.
EPA expressly concedes that § 509(b)(1) provides jurisdiction to review *modification* of a permit. Brief for Respondents at 14 n. 5a.

to act on Exxon's request for an adjudicatory hearing and legal decision for nearly three months, in apparent violation of its own regulations. *See* 40 C.F.R. § 125.-36(c)(1). Exxon asserts, and EPA does not dispute, that § 509(b)'s 90-day statute of limitations for seeking review of the denial of permit modification would have run against Exxon in a few days if it had not filed its March 1 petition for review.

In any event, two days after Exxon filed its petition for review, EPA, finally jarred into acting on Exxon's request for an adjudicatory hearing, denied it in a letter stating flatly that it constituted "final EPA action in this matter." We cannot imagine a clearer statement of the agency's own position on finality or a clearer invitation to seek judicial review. EPA certainly does not contend that we could not properly exercise jurisdiction under § 509 over Exxon's petition for review following issuance of this letter.

What EPA does argue is that its unexplained sua sponte reversal of position with regard to the adjudicatory hearing, more than three months after Exxon filed its petition for review, somehow deprived EPA's earlier action of finality retroactively. The difficulty with this argument is that it amounts to one that EPA has the power unilaterally to deprive this court of jurisdiction over a petition for review after that jurisdiction has been properly invoked. There may be cases where EPA could prevail upon us to remand a petition for review that properly invokes our jurisdiction back to the agency for further proceedings pursuant to § 509(c) [11] or in the exercise of our discretion. But in this case EPA did not seek a remand from this court; it simply declared the matter reopened and then demanded that we dismiss the petition for lack of finality. Such unilateral agency action can have no effect on our own jurisdiction over the petition for review. *Greater Boston Television Corp. v. FCC*, 149 U.S. App.D.C. 322, 463 F.2d 268, 283 (1971), *cert. denied*, 406 U.S. 950, 92 S.Ct. 2042, 32 L.Ed.2d 338 (1972); *see Anchor Line Limited v. Federal Maritime Commission*, 112 U.S.App.D.C. 40, 299 F.2d 124, 125, *cert. denied*, 370 U.S. 922, 82 S.Ct. 1563, 8 L.Ed.2d 503 (1962); *McClatchy Broadcasting Co. v. FCC*, 99 U.S.App.D.C. 199, 239 F.2d 19, 23–24 (1956), *cert. denied*, 353 U.S. 918, 77 S.Ct. 664, 1 L.Ed.2d 665 (1957).[12]

■ The second branch of EPA's finality argument consists of an assertion, closely tied to its argument on the merits, that it is not unlawful under the Act for Exxon to make deep-well disposals unless and until EPA places an express limitation on deep-well disposal in the NPDES permit that Exxon must have for its surface-water discharges. *See* Part IV *infra*. From this, EPA argues that Exxon is subject to no possible federal sanctions for deep-well disposal until EPA completes its reopened action and places express limits in the permit on Exxon's deep-well disposals. Because Exxon is subject to no threat of enforce-

11. § 509(c) expressly authorizes this court to remand to the agency for further factfinding in certain instances:

In any judicial proceeding brought under subsection (b) of this section in which review is sought of a determination under this Act required to be made on the record after notice and opportunity for hearing, if any party applies to the court for leave to adduce additional evidence, and shows to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceeding before the Administrator, the court may order such additional evidence (and evidence in rebuttal thereof) to be taken before the Administrator, in such manner and upon such terms and conditions as the court may deem proper. The Administrator may modify his findings as to the facts, or make new findings, by reason of the additional evidence so taken and he shall file such modified or new findings, and his recommendation, if any, for the modification or setting aside of his original determination, with the return of such additional evidence. The Administrator's issuance of a NPDES permit is required to be made "after opportunity for public hearing." § 402(a)(1).

12. We also take the inclusion of § 509(c), *see* note 11 *supra*, to be an indication that, in Congress' view, the Administrator would not have the power to reopen a proceeding after a petition for review was filed, without a remand from the court.

ment, EPA concludes, we should forego review at this time.

The difficulty with this argument is that it is diametrically opposed to the agency's own position up until now. As EPA recognizes, Brief for Respondents at 11 ns. 4 & 5, the December 3, 1975 letter from EPA to Exxon denying permit modification plainly implied that EPA expected Exxon to refrain from any further deep-well disposal. The threat was unmistakable that if Exxon did continue deep-well disposal after EPA had denied modification of the permit to authorize it, EPA would consider Exxon to be in violation of its permit and would take appropriate action. EPA did not disclaim this construction of the December 3 letter in its motion to this court to dismiss the petition for review, filed June 21, 1976, although it surely was clear to the agency by then that this was Exxon's construction of that letter.[13] The first time EPA *did* disclaim the threat was in its brief on the merits, filed September 21, 1976, nearly ten months after the December 3 letter was sent.

In short, the agency's eleventh hour protestation that it never really meant what it said in its December 3 letter—and what it led Exxon and this court to believe right up until EPA filed its brief on the merits—comes too late. Fairness and candor demand that an agency not order or threaten a party until the party challenges it in court, and then, in an argument directed toward avoiding the review sought by the party, claim there was never any order or threat at all. We hold that the threat to Exxon was quite real enough to support our review.

■ Finally, EPA argues the cause is not ripe for review, and cannot become ripe until the agency has the opportunity to reconsider whether Exxon's permit should be amended expressly to authorize, limit, or prohibit deep-well disposal. Yet it is plain from EPA's own admissions that the main issue in the case—that of the agency's power to place such conditions in a NPDES permit—*is* ripe. EPA conceded at oral argument that no facts would be elicited at an adjudicatory hearing before the agency that would bear on the legal issue of EPA's jurisdiction over Exxon's deep-well disposal.[14] At the same time, it represented that it had no intention of reconsidering its stance on the jurisdictional issue at such a hearing. And finally, EPA does not contend that the issue of its jurisdiction over Exxon's deep-well disposal could be mooted by anything that might happen if we did hand the case back to the agency at this point.[15] Under these circumstances, we hold that the issue of EPA's jurisdiction over Exxon's deep-well disposal is sufficiently ripe to support our consideration of it. If we were to find that EPA has the authority it claims, it would be time enough to decide whether we should entertain a motion from EPA to reconsider the manner in which it exercised that authority in this case.

## IV. EPA JURISDICTION OVER DEEP–WELL DISPOSAL.

■ The question we now consider ' is whether the Administrator of EPA, as an

**13.** EPA's letter of April 19, 1976 purporting to authorize limited deep-well disposal by Exxon, *see* note 9 *supra,* also indicates that as of that date, EPA clung to the view that Exxon was prohibited from making deep-well disposals without explicit permit authorization.

**14.** In particular, EPA has not suggested there might be a factual issue as to whether the waste materials involved in this case might migrate to surface waters that plainly are within its jurisdiction. *See* note 1 *supra.*

**15.** Even if Exxon's permit were modified to allow it to dispose of all its wants into the deep wells, Exxon still would be subject to the moni-

toring and reporting requirements of the permit and to sanctions for failing to comply with them. Given EPA's assertion of jurisdiction over deep-well disposal, its strong policy against allowing deep-well disposal, *see* note 8 *supra,* and its current representation to this court that it is powerless to do anything about deep-well disposal absent express permit conditions, it is inconceivable that EPA would not amend Exxon's permit expressly to cover deep-well disposal in some fashion. EPA has not even suggested this is a possibility.

incident to his power under § 402(a) to issue permits authorizing the discharge of pollutants into surface waters, has the authority to place conditions in such permits that control the disposal of pollutants into deep wells.

Exxon's argument is this. § 301(a) states that, "the discharge of any pollutant by any person shall be unlawful," except as in compliance with, inter alia, § 402. § 402(a)(1) provides that, "the Administrator may . . . issue a permit for the discharge of any pollutant, or combination of pollutants, notwithstanding § 301(a)," upon condition that the discharge will meet any applicable effluent limitations, standards, or guidelines established under §§ 301, 302, 306, 307, or 403, and inspection and monitoring standards established under § 308. § 402(k) provides that compliance with a permit issued under § 402 shall be deemed compliance with § 301 for the purposes of § 309 (enforcement by the Administrator) and § 505 (private enforcement).

As Exxon notes, the key phrase in §§ 301(a) and 402(a)(1) is "discharge of any pollutant." It is the act described by this phrase that is made unlawful by § 301(a) and that the Administrator is empowered to authorize by § 402(a)(1). The phrase is defined for purposes of the Act in § 502(12) (emphasis added):

> The term 'discharge of a pollutant' and the term 'discharge of pollutants' each means (A) any addition of any pollutant *to navigable waters* from any point source . . . [16]

Exxon's fundamental assertion is that the disposal of waste into deep wells is not the addition of a pollutant "to navigable waters." From this, it argues that disposal of waste into deep wells is not unlawful under § 301(a), even without the authorization of a permit issued under § 402. By the same token, it argues, § 402(a)(1) does not empower the Administrator to authorize—or to limit—disposal into deep wells. In support of its position, Exxon also points to legislative history, reviewed *infra*, that it says demonstrates Congress did not intend to extend federal control over subsurface waters.

The Administrator does not dispute Exxon's assertion that the disposal of waste into deep wells is not the "discharge of a pollutant" within the meaning of §§ 502(12), 301(a), or 402(a)(1).[17] Indeed, he

---

**16.** The § 502(12) definition of "discharge of a pollutant" also includes, "(B) any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft." The term "pollutant" is defined in § 502(6), and the term "point source" is defined in § 502(14). *See* note 19 *infra*.

**17.** In particular, he does not argue that disposal into these deep wells is the addition of a pollutant "to navigable waters" within the meaning of the Act. *Compare United States v. GAF Corp.*, 389 F.Supp. 1379, 1383–85 (S.D.Tex. 1975) *and* Note, *United States v. GAF Corp.: A Leak in the FWPCA?*, 6 Environmental Law 561, 563–64 (1975) *with* Eckert, *EPA Jurisdiction over Well Injection under the Federal Water Pollution Control Act*, 9 Natural Resources Lawyer 455, 456–58 (1975); *cf. Cappaert v. United States*, 426 U.S. 128, 143–45, 96 S.Ct. 2062, 2072–73, 48 L.Ed.2d 523, 537–38 (1976). *United States v. GAF Corp., supra*, held that deep-well injection was not the "discharge of a pollutant" under the Act because it was not the addition of a pollutant "to navigable waters." The court also rejected the argument that § 402(a)(3) confers any additional authority on the Administrator, stating "that

Congress could not possibly have meant to achieve in roundabout fashion what it expressly declined to accomplish straightforwardly." 389 F.Supp. at 1385; *see* Part IV.C. *infra*. Although the Administrator argues here that there was no "associated" surface discharge in *United States v. GAF Corp.*, and hence no real decision there on the effect of § 402(a)(3), the accuracy of that assertion is not entirely free from doubt. *See* Note, *United States v. GAF Corp.: A Leak in the FWPCA?, supra*, at 571 & n. 63.

The term "navigable waters" is defined in § 502(7) of the Act as "the waters of the United States, including the territorial seas."

An amendment was offered on the House floor that would have changed the Act's definition of "discharge of a pollutant" to include "any addition of any pollutant to ground waters from any point source." 118 Cong.Rec. 10666 (1972), 1 Environmental Policy Division, Congressional Research Service, 93d Cong., 1st Sess., *A Legislative History of the Water Pollution Control Act Amendments of 1972*, 589 (Comm. Print 1973) [hereinafter cited as *Leg. Hist.*]. The amendment did not pass. *See* text at note 31 *infra*.

expressly disclaims "jurisdiction and authority to regulate subsurface disposal directly." Brief for Respondents at 21. His is the more limited claim that when a person is disposing of waste both into surface waters *and* into deep wells, the Administrator may place conditions in the permit required for the surface discharge that limit or prohibit the subsurface disposal. But, he tells us, "EPA does not assert that a discharge into a well without specific authorization in a permit is a violation of the [Act]. Unless EPA has taken affirmative action to establish well injection requirements in an issued surface water permit, a discharge permit, a discharger may utilize well disposal in whatever manner it pleases." Letter of Clarification dated April 15, 1977; *see also* Brief for Respondents at 11 n. 4.

In support of his position, the Administrator relies on two provisions of § 402. § 402(b) is the subsection that provides for transfer of the permit-issuing function from the Administrator to a state program. It states, in relevant part:

The Administrator shall approve each such [state-]submitted program unless he

determines that adequate authority does not exist:

(1) To issue permits which—

. . . . .

(D) control the disposal of pollutants into wells; . . . [18]

§ 402(a)(3), which is part of the subsection dealing with the Administrator's issuance of permits in the absence of an approved state program, provides:

The permit program of the Administrator under paragraph (1) of this subsection, and permits issued thereunder, shall be subject to the same terms, conditions, and requirements as apply to a State permit program and permits issued thereunder under subsection (b) of this section.

The Administrator's argument is that the provision of § 402(a)(3) that his permit program "shall be subject to the same terms, conditions, and requirements as apply to a state permit program . . . under subsection (b)," means Congress intended for his program, like a state's, to have "adequate authority . . . [t]o issue permits which . . . control the disposal of pollutants into wells." [19] The Adminis-

---

**18.** The Administrator has implemented § 402(b)(1)(D) through 40 C.F.R. § 124.81, which provides:

Any State or interstate agency participating in the NPDES shall have procedures which control the disposal of pollutants into wells. Any such disposal shall be sufficiently controlled to protect the public health and welfare and to prevent pollution of ground and surface water resources.

(a) If an applicant for an NPDES permit proposes to dispose of pollutants into wells as part of a program to meet the proposed terms and conditions of an NPDES permit, the Director shall specify additional terms and conditions in the final NPDES permit which shall (1) prohibit the proposed disposal, or (2) control the proposed disposal in order to prevent pollution of ground and surface water resources and to protect the public health and welfare.·

(b) A State agency participating in the NPDES shall have procedures to prohibit or control through the issuance of permits all other proposed disposals of pollutants into wells. Following approval of the Administrator of a State program pursuant to section 402 of the Act, the Director shall permit no uncontrolled disposals of pollutants into wells within the States.

(c) Any permit issued for the disposal of pollutants into wells shall be issued in accordance with the procedures and requirements specified in this part.

(d) The Regional Administrator shall distribute to the Director and shall utilize in his review of any permits proposed to be issued by the Director for the disposal of pollutants into wells, any policies, technical information, or requirements specified by the Administrator in regulations issued pursuant to the Act or in directives issued to EPA regional offices.

We have no question before us concerning the validity of this regulation.

**19.** The Administrator also seeks solace in the definition of pollutant in § 502(6):

The term 'pollutant' means dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water. This term does not mean . . . (B) water, gas, or other material which is injected into a well to facilitate production of oil or gas, or water derived in association

trator has embodied this position in regulations setting forth his § 402(a) permit pro-

> with oil or gas production and disposed of in a well, if the well used either to facilitate production or for disposal purposes is approved by authority of the State in which the well is located, and if such State determines that such injection or disposal will not result in the degradation of ground or surface water resources.

His reasoning is that, because some well injection is excluded from the definition of "pollutant," all other well injection—including that in this case—must be included in the definition. (Exxon has not argued that the injection in this case comes within the exclusion of § 502(6)(B).)

The Administrator may well be right, but because he has conceded that deep-well disposal is not the "discharge of a pollutant" within the Act, *see* text and note at note 17 *supra*, this does not advance his argument one whit. The effect of § 502(6)(B), as Congress well recognized, was to exclude the specified well injections even from the study provisions of the Act, and not to imply that other well injections were within the control provisions. *See* notes 29, 30, and 31 *infra*.

The Administrator also notes the definition of "point source" in § 502(14):

> The term 'point source' means any discernible, confined and discrete conveyance, including but not limited to any . . . well . . . from which pollutants are or may be discharged.

The inclusion of "well" in this definition again does not advance the Administrator's argument, for the reason noted in the paragraph above. In addition, it is less than perfectly clear that Congress considered disposal *into* wells to be point-source pollution. *See* § 304(e); S.Rep.No.414, 92d Cong., 1st Sess. 52 (1971), 2 *Leg.Hist.* 1470, U.S.Code Cong. & Admin.News 1972, pp. 3668, 3718 ("[T]he Administrator is required to issue information to the States and to the public on the processes, procedures, and methods to control pollution related to non-point sources. Included within this category are activities such as . . . disposal of materials in wells . . .")

20. 40 C.F.R. § 125.26(a), which is a portion of the Part setting forth the Administrator's permit program, states:

> (1) If an applicant for a permit is disposing or proposes to dispose of . pollutants into wells as part of a program to meet the proposed terms and conditions of a permit, the Regional Administrator shall specify additional terms and conditions in the permit which shall (i) prohibit the disposal, or (ii) control the disposal in order to prevent pollution of ground and surface water resources and to protect the public health and welfare.

gram,[20] and the General Counsel for EPA has concurred.[21]

> (2) The Regional Administrator shall utilize in his review of any permits proposed to be issued for the disposal of pollutants into wells, any policies, technical information, or requirements, specified by the Administrator in regulations issued pursuant to the Act or in directives issued to regional offices.

21. In an opinion dated December 13, 1973 the Office of the General Counsel set forth the following questions, answers, and discussion:

> *Question*:
>
> Would disposal of pollutants into wells in each of the following situations be covered by the NPDES?
>
> (a) The discharger has an existing surface water discharge. He proposes as part of an abatement program to divert a portion of his waste stream to a well, while continuing to discharge the remainder to the surface water.
>
> (b) The discharger has an existing surface water discharge. He proposes as part of an abatement program to discontinue his surface water discharge and divert his entire waste stream to a disposal well.
>
> (c) The discharger has an existing surface water discharge and also currently disposes of a portion of his waste stream into a well. He proposes to continue this practice.
>
> (d) The discharger has an existing surface water discharge and also currently disposes of a portion of his waste stream into a well. He proposes as part of an abatement program to discontinue his surface water discharge and divert his entire waste stream to a disposal well.
>
> (e) The discharger currently has no surface water discharge and disposes of all his wastewaters into a well. He proposes to continue this practice.
>
> (f) The discharger currently has no surface water discharge and disposes of all of his wastewaters into a well. He now proposes to divert a portion of his waste stream to a surface water discharge.
>
> (g) The discharger has no existing discharge and proposes to commence a new discharge. He intends to dispose of all his wastewaters into a well.
>
> (h) The discharger has no existing discharge and proposes to commence a new discharge. He intends to dispose of a portion of his wastewaters into a well and discharge the remainder to a surface water.
>
> *Answer*:
>
> If a State NPDES program has been approved, the State would be required to control the well disposal in all the listed situations. Prior to State NPDES program approval, in all the listed situations except (e) and (g), the Regional Administrator must establish conditions in the NPDES permit for discharge into navigable water. Such condi-

tions must prohibit the well disposal, or must control such disposal in order to prevent pollution of ground and surface water resources and to protect the public health and welfare.
*Discussion*:

In your memorandum of November 20, you set forth the eight hypothetical situations listed above. In all cases, if a State permit program has been approved, Subpart I of EPA's State Program Guidelines (40 CFR § 124.80) would be applicable. If no State program has been approved, the Administrator's authority is set forth in 40 CFR Part 125.

Jurisdiction over a permittee is based upon § 301 of the Act, which provides that the 'discharge of a pollutant' is unlawful except as in compliance with the regulatory provisions of the Act. Section 402 authorizes the Administrator to issue a permit 'for the discharge of a pollutant.' Under § 502(12) the term 'discharge of a pollutant' is defined so as to include only discharges into navigable waters (or the contiguous zone of the ocean). Discharges into ground waters are not included. Accordingly, permits may not be issued, and no application is required, unless a *discharge into navigable waters is proposed* or is occurring.

Section 125.26(a) of the NPDES regulations requires the Regional Administrator to formulate and apply permit conditions to prevent pollution of surface and underground water resources whenever disposal into wells is contemplated as part of a program to comply with effluent limitations and other requirements in an NPDES permit. This provision cannot, of course, extend EPA's jurisdiction to cover disposal into wells not in connection with discharges into navigable waters. However, whenever a permit is issued for a discharge into navigable waters, § 125.26(a) requires controls to be applied to associated discharges into wells.

Thus, with respect to your specific questions, application of the principles set forth above indicates that an NPDES permit would be required in all cases where there is now, or is proposed, a discharge into navigable waters. In all such cases, 40 CFR § 125.26(a) requires permit conditions to prohibit well disposal, or to control such disposal in order to prevent pollution of ground and surface water resources and to protect the public health and welfare. Only in cases (e) and (g) in your memorandum is there no discharge into navigable waters. Thus, in these cases, no Federal NPDES permit would be required, and the Regional Administrator would have no authority to impose conditions concerning well disposal.

In his Decision on Matter of Law Pursuant to 40 C.F.R. § 125.36(m) No. 6, dated April 8, 1975, the General Counsel adhered to this position in the face of *United States v. GAF Corp.*, 389 F.Supp. 1379 (S.D.Tex.1975), *see* note 17 *supra*:

*QUESTION PRESENTED*

Does the Environmental Protection Agency have the authority to regulate the injection of industrial waste by NPDES permits?

*CONCLUSION*

The Environmental Protection Agency has authority to control well injection through conditions in NPDES permits issued for discharges into navigable waters.

*DISCUSSION*

The Office of General Counsel concluded, in an opinion of law dated December 13, 1973 (attached), that disposal of pollutants into wells is subject to regulation through conditions in an NPDES permit issued for an associated surface water discharge. See 40 CFR § 125.26. The only question which requires consideration here is whether this conclusion must be altered in light of the decision of the District Court for the Southern District of Texas in *United States v. GAF* [389 F.Supp. 1379].

In the *GAF* case, the United States sought a temporary restraining order, and temporary and permanent injunctive relief, to prevent the drilling of subsurface wells for disposal of organic chemical wastes. From the opinion, it does not appear that GAF had received a permit for any associated surface water discharge. The court held that 'The disposal of chemical wastes into underground waters which have not been alleged to flow into or otherwise affect surface waters does not constitute a discharge of a pollutant . . . .'

The court's conclusion has little relevance to the issue of the Agency's authority to include conditions in a permit for disposal into surface navigable waters which would control associated well discharge. The court was, in fact, careful to draw this distinction in its opinion:

Plaintiff has not complained of a violation of 'any permit condition or limitation' by defendant. Indeed, there is no allegation that the Administrator has found such a violation by defendant. This Court's jurisdiction depends, therefore, on whether the Administrator could have found that the defendant is 'in violation of section 1311, 1312, 1316, 1317, or 1318' of Title 33.

The court, in other words, rested its holding in relevant part upon whether or not a discharge of a pollutant into underground waters itself constituted a discharge into navigable waters invoking the regulatory requirements of the FWPCA. It specifically declined to address the range of discretion which the Act confers upon the Administrator in establishing conditions in permits for discharges into surface navigable waters. Similarly, the provisions of EPA's NPDES regulations which require control of well disposal in connection with NPDES permits for surface water discharges were not con-

On its face, the Administrator's reading of the statute is not implausible. The fact remains, however, that § 402(a)(1) grants the Administrator authority only to control discharges into navigable waters. § 402(a)(3) is addressed to the manner in which that authority is to be exercised, but on its face it does not purport to extend the Administrator's authority to encompass nonnavigable waters. In addition, the Administrator's reading would have the strange result of dividing jurisdiction over deep-well injections between federal and state authorities, based on the apparently fortuitous factor of whether the person engaging in the deep-well injection also happens to be engaging in "associated" surface discharges. In these circumstances, we think the Administrator's reading requires some scrutiny.

We are mindful that where "this construction by the agency charged with the enforcement of the [1972] Amendments is reasonable and in the absence of any cogent argument that it is contrary to congressional intentions," we should sustain the agency's construction. *EPA v. State Water Resources Control Board, supra,* 426 U.S. at 227, 96 S.Ct. at 2035, 48 L.Ed.2d at 595; *see also E. I. duPont de Nemours & Co. v. Train, supra,* —— U.S. at ——, 97 S.Ct. at 978–979, 51 L.Ed.2d at 221–22. But we also have been told, again with specific reference to the 1972 Amendments, that, " '[w]hen aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no "rule of law" which forbids [the use of legislative history], however clear the words may appear on "superficial examination." ' " *Train v. Colorado Public Interest Research Group,* 426 U.S. 1, 10, 96 S.Ct. 1938, 1942, 48 L.Ed.2d 434, 441 (1976), *Quoting United States v. American Trucking Ass'ns,* 310 U.S. 534, 543–44, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940). With these injunctions in mind, we have examined the structure of the Act and its legislative history in an attempt to discern the congressional intent with regard to the question here. What we have found belies an intention to impose direct federal control over any phase of pollution of subsurface waters. Instead, the congressional plan was to leave control over subsurface pollution to the states until further studies, provided for in the Act, determined the extent of the problem and possible methods for dealing with it. In our view, the evidence is so strong that Congress did not mean to substitute federal authority over groundwaters for state authority that the Administrator's construction, although not unreasonable on its face, must give way because "it is contrary to congressional intentions." *EPA v. State Water Resources Control Board, supra,* 426 U.S. at 227, 96 S.Ct. at 2035, 48 L.Ed.2d at 595. In order to demonstrate the reasons for our conclusion, we turn now to a close examination of those portions of the Act and of its legislative history that deal with deep-well injection and groundwater pollution.

A. *Other Provisions in the Act Dealing With Groundwater.* The 1972 Amendments have been criticized as dealing "only ambiguously and, in some cases, inconsistently with the subject of groundwater." 118 Cong.Rec. 10666 (1972), 1 *Leg.Hist.* 589 (remarks of Rep. Aspin). Nonetheless, we think that a clear pattern of congressional intent with respect to groundwaters emerges upon close examination of those sections of the Act that deal with the subject. That pattern is one of federal information gathering and encouragement of state efforts to control groundwater pollution—but not of direct federal control over groundwater pollution.

A number of provisions in Title I of the Act, "Research and Related Programs," direct the Administrator to investigate and begin developing ways to deal with pollution of underground waters, as well as of other waters. § 102, "Comprehensive Programs for Water Pollution Control," provides (emphasis added):

sidered by the court, and their validity was not at issue.

Accordingly, we conclude that the *GAF* opinion does not modify the opinion of De-

cember 13, 1973, and that opinion is reaffirmed.

(a) The Administrator shall, after careful investigation, and in cooperation with other Federal agencies, interstate agencies, and the municipalities and industries involved, prepare or develop comprehensive programs for preventing, reducing, or eliminating the pollution of the navigable waters *and ground waters* and improving the sanitary condition of surface *and underground waters.* . . .

§ 104, "Research, Investigations, Training, and Information," provides (emphasis added):

(a) The Administrator shall establish national programs for the prevention, reduction, and elimination of pollution and as part of such programs shall—

. . . . .

(5) in cooperation with the States, and their political subdivisions, and other Federal agencies establish, equip, and maintain a water quality surveillance system for the purpose of monitoring the quality of the navigable waters *and ground waters* and the contiguous zone and the oceans . . .

And § 106, "Grants for Pollution Control Programs," provides (emphasis added):

(e) Beginning in fiscal year 1974 the Administrator shall not make any grant under this section to any State which has not provided or is not carrying out as a part of its program—

(1) the establishment and operation of appropriate devices, methods, systems, and procedures necessary to monitor, and to compile data on . . . the quality of navigable waters *and to the extent practicable, ground waters*

. . .

These sections demonstrate that Congress meant, at the least, for the Administrator and the states to begin developing the information necessary to assess and deal with groundwater pollution.

In Title II, "Grants for Construction of Treatment Works," Congress included two provisions designed to encourage protection of groundwater in the Administrator's authorization to make grants to state and local authorities for the construction of waste treatment facilities. § 202(a) provides that the federal grant for projects approved by the Administrator between January 1 and July 1, 1971 but not begun before July 1 shall be increased to 75 per cent of the project's cost, but only if (emphasis added):

(2) the State water pollution control agency or other appropriate State authority certifies that the quantity of available *ground water* will be insufficient, inadequate, or unsuitable for public use, including the ecological preservation and recreational use of surface water bodies, unless effluents from publicly-owned treatment works after adequate treatment are returned to the *ground water* consistent with acceptable technological standards.

Similarly, § 208(b), which sets up a process and authorizes grants designed to encourage and facilitate establishment of area-wide waste treatment management plans, requires (emphasis added):

(2) Any plan prepared under such process shall include, but not be limited to—

. . . . .

(K) a process to control the disposal of pollutants on land or in subsurface excavations within such area to protect *ground* and surface *water* quality;

. . .

Thus, in at least two provisions of Title II, Congress employed the power of the federal purse to encourage protection by the states of underground waters.

Perhaps the most important provisions in the first three titles of the Act dealing with groundwaters are found in Title III, "Standards and Enforcement." § 304, "Information and Guidelines," requires the Administrator to perform a number of specified tasks. Subsection (b) of § 304 has received the most attention, because it directs the Administrator to publish guidelines identifying the degree of effluent reduction attainable through application of the best practicable (§ 304(b)(1)(A)) and best available (§ 304(b)(2)(A)) technology for classes of existing point sources. These § 304(b)

guidelines, in turn, are to be used by the Administrator in setting the effluent limitation regulations for classes of point sources required by § 301(b). The § 301(b) limitations then are incorporated into § 402 permits. *See generally E. I. duPont de Nemours & Co. v. Train, supra.* Thus, Congress meant that the guidelines drawn by the Administrator under § 304(b) eventually would become enforceable limitations on individual dischargers.

Other subsections of § 304, however, direct the Administrator to develop information and guidelines which are not to be transformed by other portions of the Act [22] into enforceable limitations on individual dischargers. Two of these other subsections concern pollution of subsurface waters. § 304(a) provides, in relevant part (emphasis added):

(1) The Administrator, after consultation with appropriate Federal and State agencies and other interested persons, shall develop and publish, within one year after the date of enactment of this title (and from time to time thereafter revise) criteria for water quality accurately reflecting the latest scientific knowledge (A) on the kind and extent of all identifiable effects on health and welfare . . which may be expected from the presence of pollution in any body of water, *including ground water* ; . . .

(2) The Administrator, after consultation with appropriate Federal and State agencies and other interested persons, shall develop and publish, within one year after the date of enactment of this title (and from time to time thereafter revise) information (A) on the factors necessary to restore and maintain the chemical, physical, and biological integrity of all navigable waters, *ground waters,* waters of the contiguous zone, and the oceans;

. . .

(3) Such criteria and information and revisions thereof shall be issued to the States and shall be published in the Fed-

eral Register and otherwise made available to the public.

And § 304(e) provides (emphasis added):

The Administrator, after consultation with appropriate Federal and State agencies and other interested persons, shall issue to appropriate Federal agencies, the States, water pollution control agencies, and agencies designated under section 208 of this Act, within one year after the effective date of this subsection (and from time to time thereafter) information including (1) guidelines for identifying and evaluating the nature and extent of nonpoint sources of pollutants, and (2) processes, procedures, and methods to control pollution resulting from—

.    .    .    .    .

(D) *the disposal of pollutants in wells or in subsurface excavations* ; . . .

Such information and revisions thereof shall be published in the Federal Register and otherwise made available to the public.

These provisions, like the provisions in Title I that we reviewed above, are designed to help develop and distribute the basic information and methods needed to cope intelligently with groundwater pollution. But the absence of other provisions in the Act, analogous to § 301(b), for transforming this information into enforceable limitations, strongly suggests that Congress meant to stop short of establishing federal controls over groundwater pollution, at least for the time being. Instead, the measures—especially in light of their requirements that the information developed be distributed to the states—suggest that Congress meant for the states to benefit from the knowledge being developed while retaining control of their own groundwater pollution control programs. The simple requirement of § 402(b)(1)(D) that *state* permit programs have adequate authority to issue permits which control the disposal of pollutants into wells, which is not fleshed out elsewhere in the Act or mirrored in any of the sections

---

**22.** "There is no provision for compliance with § 304, the guideline section." *E. I. duPont de Nemours & Co. v. Train, supra,* —— U.S. at

—— n. 6, 97 S.Ct. at 970, 51 L.Ed.2d at 212 n. 6.

setting forth the Administrator's powers, is entirely consistent with such an intention. The Administrator's reading of § 402(a)(3) as giving *him* power to control groundwater pollution resulting from deep-well disposal, then, would stand in sharp contrast to the evident structure of the rest of the Act.

B. *Legislative History.* Our reading of the statute gains strong support from the report of the Senate Committee on Public Works that accompanied the bill in that chamber. The report contains an explanation of the requirement of § 402(b)(1)(D) that a state permit program, to be approved by the Administrator, must have adequate authority to issue permits which control the disposal of pollutants into wells. Although the report demonstrates the committee's concern over groundwater pollution, it also evidences a clear intent to leave the establishment of standards and controls for groundwater pollution to the states:

> Several bills pending before the Committee provided authority to establish Federally approved standards for groundwaters which permeate rock, soil, and other subsurface formations. Because the jurisdiction regarding groundwaters is so complex and varied from State to State, the Committee did not adopt this recommendation.

> The Committee recognizes the essential link between ground and surface waters and the artificial nature of any distinction. Thus the Committee bill requires in section 402 that each State include in its program for approval under section 402 affirmative controls over the injection or placement in wells of any pollutants that may affect ground water. This is designed to protect ground waters and eliminate the use of deep well disposal as an uncontrolled alternative to toxic and pollution control.

S.Rep.No.414, 92d Cong., 1st Sess. 73 (1971), 2 *Leg.Hist.* 1491, U.S.Code Cong. & Admin. News 1972, p. 3739.[23] The report's explanation of § 304 suggests that the "information and guidelines" relating to groundwater pollution that that section requires the Administrator to develop are intended to help the states administer the well disposal control programs envisioned in § 402(b)(1)(D):

> In order to reflect the change in emphasis of the Federal Water Pollution Control Act, the Administrator is required to issue information to the States and to the public on the processes, proce-

---

**23.** The Senate report continues:

The importance of groundwater in the hydrological cycle cannot be underestimated. Although only about 21.5 percent of our domestic, industrial [, and] agricultural supply comes directly from wells, it must be remembered that rivers, streams and lakes themselves are largely supplied with water from the ground—not surface runoff.

Present water pollution control programs concentrate on the control of pollutants placed in surface waters, on the assumption that to control these inputs will assure desirable qualities in the groundwaters. Unfortunately, this is not always the case. Groundwaters, due to their much larger volume than surface waters, their slow natural rates of circulation, and their almost complete absence of living organisms can accept more pollutants with less obvious, direct degradation than can well-defined lakes and rivers with their telltale biologic indicators of chemical change. However, due to the lack of organisms and slow circulation, polluted groundwaters generally have no 'self-cleaning' mechanisms, and could remain polluted for centuries.

Groundwater pollution is not as serious a national problem as is surface water pollu-

tion, but groundwater availability and quality is deteriorating. In some locales, serious hazard exists. Deep-well disposal raises a possibility of irrevocable damage to public aquifers and slow dissemination of pollutants into potential water supplies. Deep water wells are not now widely used for public water supplies except in water-short areas like west Texas and Nebraska where shallower groundwaters have been virtually exhausted since the end of the second world war. However, deep disposal wells are becoming more prevalent throughout the nation, while deep wells are predicted to supply increasing percentages of public water in the arid west and southwest in the next two decades.

S.Rep.No.414, *supra*, at 73, 2 *Leg.Hist.* 1491, U.S.Code Cong. & Admin.News 1972, p. 3739.

The committee reached these conclusions only after one of its subcommittees held extensive hearings on the subject of deep-well injection and groundwater pollution. *See Hearings on S.75 et al. before the Subcomm. on Air and Water Pollution of the Senate Comm. on Public Works,* 92d Cong., 1st Sess., part 7 (1971).

dures, and methods to control pollution related to non-point sources. Included within this category are activities such as . . . disposal of material in wells . . . . While many of these activities are the subject, directly or indirectly, of Federal programs established for other purposes, the bill for the first time directs attention to these activities in the context of integrated water pollution control.

. . . . .

Guidelines for disposal of material in deep wells may range from provisions for evaluating geological characteristics of disposal sites to the costs and benefits of alternative methods of disposal. For shallower disposal sites, the main concern is for groundwater contamination. Provisions should be outlined to control leaching of materials from such sites, which include land-fill sites as well as abandoned mines.

S.Rep.No.414, *supra*, at 52–53, 2 *Leg.Hist.* 1470–71, U.S.Code Cong. & Admin.News 1972, p. 3718. Thus, as we read the Senate report, the committee did not intend to interfere with or displace the "complex and varied" state jurisdictions over groundwaters. Rather, it meant only to help provide the states with the information needed to operate their own groundwater pollution control programs, the establishment of which § 402(b)(1)(D) was designed to encourage.

We come now to a hiatus in the legislative history. The bills reported to and passed by the Senate and the House were identical, or nearly so, in many respects. The bills were identical in the provision of § 402(b)(1)(D) requiring that a state permit program, to be approved by the Administrator, must have adequate authority to control disposal of pollutants into wells.[24] But the bill passed by the Senate, to which the above-quoted Senate report referred, did not contain § 402(a)(3)—the provision stating that the Administrator's permit program shall be subject to the same terms, conditions, and requirements as apply to a state program. Thus, under the Administrator's own theory, which rests exclusively on § 402(a)(3), the Senate bill would have given him no power over deep-well disposal.

The bill reported to and passed by the House did contain § 402(a)(3), as does, of course, the bill that emerged from the conference committee and was enacted.[25] Nothing in the House report[26] or in either conference report[27] explains why § 402(a)(3) was added or what effect it was expected to have. But as far as we can determine, no one in the House or in the conference committee ever imagined that the addition of § 402(a)(3) would authorize the Administrator to assert the jurisdiction over deep-well disposal that the Senate had so carefully withheld. Instead, what we find in the legislative history from the House is a consistent assumption that the House bill, like the Senate bill, did not authorize federal control over any phase of groundwater pollution.

After the Senate passed its version of the bill, the bill went to the House, where it was referred to the Committee on Public Works. That committee introduced its own bill, H.R.11896, which was different in certain respects from the Senate bill, S.2770. One of these differences was the addition of § 402(a)(3).

The Committee on Public Works held four days of hearings on H.R.11896 in December of 1971. At these hearings, Repre-

---

**24.** *Compare* § 402(b)(1)(D) of S.2770, 2 *Leg. Hist.* 1687, *with* § 402(b)(1)(D) of H.R. 11896, 1 *Leg.Hist.* 1056.

**25.** §§ 402(a)(1) and (a)(2) of S.2770 were the same as §§ 402(a)(1) and (a)(2) of H.R.11896. *Compare* 2 *Leg.Hist.* 1685–86 with 1 *Leg.Hist.* 1052–53. § 402(a)(3) in the House bill was inserted between §§ 402(a)(2) and (a)(3) of the Senate bill, and § 402(a)(3) in the Senate bill became, with modification, §§ 402(a)(4) and

(a)(5) in the House bill and in the statute as enacted.

**26.** H.R.Rep.No.911, 92d Cong., 2d Sess. (1972), 1 *Leg.Hist.* 753–892.

**27.** S.Conf.Rep.No.1236, 92d Cong., 2d Sess. (1972), 1 *Leg.Hist.* 281–389, U.S.Code Cong. & Admin.News 1972, p. 3776; H.R.Conf.Rep.No. 1465, 92d Cong., 2d Sess. (1972).

sentative Aspin of Wisconsin testified in favor of adding the federal standards and controls over groundwater pollution that, to his understanding, neither the Senate *nor the House* version of the bill incorporated.[28] His testimony by its terms treats the Senate and House bills as identical in this respect, and it contains no hint that the addition of § 402(a)(3) changed the Administrator's power over groundwater.[29]

Similarly, the House report issued by the committee indicates that the Administrator was only expected to begin gathering information on well injection and groundwater pollution. In the portion of the report explaining § 304(e), the committee said:

> The Committee . . . expects the Administrator to be most diligent in gathering and distribution of . . . information on processes, procedures, and methods for control of pollution from such nonpoint sources as . . . the disposal of pollutants in wells or other subsurface excavations . . .

H.R.Rep.No.911, 92d Cong., 2d Sess. 109 (1972), 1 *Leg.Hist.* 796. And Representative Abzug's and Rangel's "additional views" to this committee report state an understanding that, under the House bill, "injection well disposals are not covered by the permit system under section 402." H.R. Rep.No.911, *supra,* at 411, 1 *Leg.Hist.* 880.[30]

Finally, when the bill reached the floor of the House, Representative Aspin introduced an amendment to bring groundwater within the permit provisions of Title IV, stating:

> section 401(a)(1) and 402(a)(1). This would simply allow ground-water pollution to be regulated in the same manner as the pollution of the Nation's other water resources, which are included under the provisions of title IV.

*Hearings on H.R.11896 et al., supra,* at 728.
Earlier in the same hearings, Mr. David R. Zwick also recommended "that the disposal of wastes and other materials in injection wells fall under the permit system in section 402." *Hearings on H.R.11896 et al., supra,* at 436.

---

**28.** Representative Aspin said:

> There are a couple of very basic problems with [the Senate and House] bills' treatment of ground water pollution which are so severe that they appear, without reason or rationale, to virtually exempt the subject of ground water pollution from the purview of Federal study and regulation. At this point, I would like to quote and refer to various sections of the Senate bill S.2770. These references will apply equally to H.R.11896 . . .
>
> The term 'ground waters' is referred to frequently throughout S.2270. Section 102(a), for example, states [quoting].
>
> The term 'ground waters' also appears in section 104(a)(4), 106(6)(2)(I), 304(a)(1) and (2), and 304(e)(E). Title IV—'Permits and Licenses'—as the committee knows, provides much of the teeth in this legislation by establishing the basic procedures involved in the setting and enforcing of water pollution standards. Nowhere in title IV is the term 'ground waters['] mentioned. Both section 401(a)(1) and 402(a) use the term 'navigable waters' but omit reference to ground waters. Why ground waters should be conspicuously included in the other four titles of the bill, but not title IV, is a mystery to me. I searched through the report of the Senate Public Works Committee but was unable to find any explanation whatsoever for this apparent, and significant inconsistency.

*Hearings on H.R.11896 et al. before the House Committee on Public Works,* 92d Cong., 1st Sess. 727 (1972). (As we have noted, the Senate report *does* contain an explanation of the Senate bill's approach to groundwater. *See* text and note at note 23 *supra.* ) Representative Aspin went on to recommend

> that the term 'ground waters' should be included after the term 'navigable waters' in

**29.** Representative Aspin also objected to the exclusion of some deep-well injections from the definition of "pollutant." *Hearings on H.R. 11896 et al., supra,* at 727–29; *see* note 19 *supra.* He stated his understanding that the exclusion,

> if left in [the bill], would mean that the Administrator of the EPA would not even have the authority to obtain data, conduct studies, and make recommendations for the establishment of environmentally sound regulations of 99 percent of the country's waste injection wells—the primary industrial polluters of the Nations ground water resources.

*Hearings on H.R.11896 et al., supra,* at 728.

**30.** The thrust of these representatives' statement went to the exclusion of some deep-well injections from the definition of "pollutant." *See* note 19 *supra.* Like Representative Aspin, *see* note 29 *supra,* it was their understanding that:

> This exemption has the effect of preventing the EPA from even studying or publishing information on, or making plans to control, pollution of ground water from the oil industry's injection wells.

H.R.Rep.No.911, *supra,* at 411, 1 *Leg.Hist.* 880.

[T]he amendment brings ground water into the subject of the bill, into the enforcement of the bill. Ground water appears in this bill in every section, in every title except title IV. It is under the title which provides EPA can study ground water. It is under the title dealing with definitions. But when it comes to enforcement, title IV, the section on permits and licenses, then ground water is suddenly missing. That is a glaring inconsistency which has no point. If we do not stop pollution of ground waters through seepage and other means, ground water gets into navigable waters, and to control only the navigable water and not the ground water makes no sense at all.

118 Cong.Rec. 10666 (1972), 1 *Leg.Hist.* 589 (remarks of Rep. Aspin). A heated debate over the amendment ensued.[31]

Representative Clausen of California, a member of the Committee on Public Works and a sponsor of H.R.11896, spoke at length in opposition to the amendment and explained why groundwaters were not included in the Title IV permit provisions:

Mr. Chairman, in the early deliberations within the committee which resulted in the introduction of H.R.11896, a provision for ground waters, similar to that suggested by the gentleman from Wisconsin, was thoroughly reviewed and it was determined by the committee that there was not sufficient information on ground waters to justify the types of controls that are required for navigable waters.

We recognized this lack of information and date [*sic*; data?] and the committee sought to correct it.

.        .        .        .        .

We recognized the need for control of the disposal of pollutants into wells in order to protect our ground waters. Therefore, in section 402(b)(1)(D) we provided that the Administrator shall approve a State program unless he determines that authority does not exist to control the disposal of pollutants into wells.

As I stated, the committee recognizes the need for research and development both in determining the effects of underground disposal of pollutants and the migration of such pollutants.

The Administrator under his broad research powers as set out in sections 104, 105, and 106 is expected to concentrate a portion of his research effort on the study of underground disposal in order that the Congress might have a basis for determining the need and appropriately extending the controls of H.R.11896 as they apply to navigable waters to ground waters if needed.

118 Cong.Rec. 10667 (1972), 1 *Leg.Hist.* 590–91 (remarks of Rep. Clausen).

Representative McClory of Illinois, in turn, rose in support of the amendment, arguing, "Mr. Chairman, to consider that we are providing for the protection of the surface waters—which we can see—and omitting from the strong provisions of this measure vast ground-water supplies—is to my mind unthinkable." 118 Cong.Rec. 10668 (1972), 1 *Leg.Hist.* 594 (remarks of Rep. McClory).

Representative Harsha of Ohio, also a member of the Committee on Public Works and a sponsor of H.R.11896, joined in opposition to the amendment:

Mr. Chairman, the first part of this amendment purports to require water-quality standards for ground water. We do not have the knowledge or the technology to devise water-quality standards for ground water. We do not as yet know how to do that; we do not have the ability. That is why we have provided for the study by the Administrator to determine that.

118 Cong.Rec. 10668 (1972), 1 *Leg.Hist.* 594 (remarks of Rep. Harsha).

Representative Sisk of California rose in opposition to the amendment, and he had this exchange with Representative Harsha:

---

**31.** A portion of this debate centered on whether some deep-well injections should be excluded from the definition of "pollutant." *See* notes 19, 29, and 30 *supra.* It is unnecessary, for our purposes, to rehearse comments during the debate that were directed to this issue.

[Mr. SISK.] Mr. Chairman, I think this is a very dangerous amendment, and I hope that we do not accept it lightly because, as I understand, what they are attempting to do here is bring ground water under the control of the EPA. It is further my understanding that the committee has provided for a study of this subject.

Is this correct?

Mr. HARSHA. The gentleman is correct.

Mr. SISK. I am wholly in favor of that. I recognize the possibility of pollution of ground water, but this whole matter at this point in time, with no more knowledge than we have, bringing this ground water under this type of control, is improper, and I think is a very dangerous thing to do. I would certainly hope that the House would not adopt the amendment.

118 Cong.Rec. 10669 (1972), 1 *Leg.Hist.* 596 (remarks of Reps. Sisk and Harsha). After this debate, the House rejected Representative Aspin's amendment by a vote of 86 to 34. 118 Cong.Rec. 10669 (1972), 1 *Leg.Hist.* 597.

Thus, throughout the House hearings on H.R.11896, the House report, and the House debate on the Aspin amendment, there is not the slightest hint that any Member thought the bill would grant the Administrator any power to regulate deep-well dis-

posal or any other form of groundwater pollution. Instead, all the evidence points to precisely the opposite understanding. As we read these materials, the House, like the Senate, thought the bill would leave control of groundwater pollution exclusively to the states for the time being, while the Administrator began assembling the information needed for Congress to legislate intelligently on the subject.[32]

C. *Summary and Conclusion.* The Administrator seeks to avoid the force of all this legislative history by arguing that it goes only to the question whether Congress intended to grant him authority to set standards and issue permits for *all* disposals into underground waters, and not to the question of the more limited authority that he claims under § 402(a)(3).[33] We think, however, that the legislative history demonstrates conclusively that Congress believed it was not granting the Administrator *any* power to control disposals into groundwater. It is inconceivable to us that the House could have added § 402(a)(3), or that the conference committee could have accepted it, with the intention of granting the Administrator even this more limited authority to control disposal into groundwater, without some statement to that effect appearing somewhere in the legislative history. We cannot attribute to Congress an intention to achieve silently and by indirection that which it consistently refused to do directly.

---

**32.** This intention was consummated in part two years later when Congress enacted the Safe Drinking Water Act of 1974, Pub.L. 93–523, 88 Stat. 1660 *et seq.*, 42 U.S.C. § 300f *et seq.* Part C of the Act deals explicitly and comprehensively with the subject of deep-well injections. The Administrator has not invoked any authority under this Act in this case.

**33.** The Administrator also seeks support from the House Report that accompanied the Safe Drinking Water Act of 1974, *see* note 32 *supra.* This report states:

[W]hile it appears that EPA may prescribe its own program to control the disposal of pollutants into wells if it disapproves a State's permit authority application, this conclusion has not yet been reached in any judicial decision. Moreover, the Federal Water Pollution Control Act's restrictive definition of pollutant may prevent any Federal control system from adequately protecting underground

drinking water sources. Finally, it appears that the Federal Water Pollution Control Act may not authorize any regulation of deep well injection of wastes which is not carried out in conjunction with a discharge into navigable waters. See U.S.E.P.A., *Opinion of Acting Deputy General Counsel,* # 590, December 13, 1973. For these reasons and for the reasons which follow, the Committee has determined that broadened and strengthened legislation to assure safe drinking water is necessary.

H.R.Rep.No.1185, 93d Cong., 2d Sess. 4 (1974), U.S.Code Cong. & Admin.News 1974, p. 6457. At most, we think this statement shows the committee's recognition that the courts, not the 93d Congress, must decide what the 92d Congress intended in the 1972 Amendments. We do not think it can be read either to support or to undermine the Administrator's position here.

This is especially true in light of the reason expressed so often during the House debate on the Aspin amendment for *not* bringing groundwater pollution under federal controls. As Representative Harsha said, "We do not have the knowledge or the technology to devise water-quality standards for ground water. We do not as yet know how to do that; we do not have the ability." 118 Cong.Rec. 10668 (1972), 1 *Leg. Hist.* 594 (remarks of Rep. Harsha). Congress hardly could have meant for the Administrator to undertake regulation of groundwater pollution without the basic information that Congress itself thought was needed to decide what kinds of controls might be appropriate. We think it ill-behooves the Administrator to rush in where, for lack of knowledge, Congress feared to tread. We therefore must conclude that § 402(a)(3) was not intended to grant the Administrator the power to control deep-well disposal of wastes, even in the circumstances presented here.[34]

Our conclusion might appear anomalous at first. If Congress was concerned enough about deep-well disposal to require that a state have adequate authority to control it before its § 402(b) permit program could be approved, one might ask, could Congress really have intended that the Administrator would not have the power to control well disposal himself when a state program containing such authority had not yet been approved? That is, did Congress mean for well disposal to go uncontrolled by anyone unless and until a state permit program was approved and in operation?

The answer is that, in most states, deep-well disposal will *not* go uncontrolled until a state § 402(b) permit program is approved. Congress had evidence before it that most states already have some method for controlling deep-well disposal.[35] Indeed, in the case before us, Exxon was required to and did obtain permission from the Alabama Oil and Gas Board to conduct its deep-well disposal operation. Thus, our construction does not leave deep-well disposal entirely unregulated during the period when the Administrator operates a § 402(a) permit program. Instead, it avoids creating either conflicts[36] or senseless bifurcation[37] in jurisdiction over deep-well

---

**34.** As we have noted, we have found no indication in the legislative history as to what *was* the intention behind § 402(a)(3). On its face, however, it cannot be read to require that the Administrator's permit program contain each and every feature that § 402(b) requires in a state program. For instance, § 402(b)(4) requires that a state permit program have adequate authority "[t]o insure that the Administrator receives notice of each [permit] application." Read with perfect literalism, § 402(a)(3) would require that the Administrator's own permit program also have adequate authority "[t]o insure that the Administrator receives notice of each application." But Congress plainly could not have meant for the Administrator to notify himself of each application filed with himself.

Reading § 402(a)(3) together with other parts of § 402(b) in a literal manner also produces a number of redundancies with other portions of the Act that grant the Administrator authority directly. *Compare, e.g.,* § 402(b)(2)(B) *with* § 308; § 402(b)(7) *with* § 309.

We do not, of course, decide today what portions of § 402(b) § 402(a)(3) *was* meant to "incorporate." We simply hold that it was not meant to grant the Administrator the power he argues for here.

**35.** *See, e.g., Hearings on S.75 et al. before the Subcomm. on Air and Water Pollution of the Senate Comm. on Public Works,* 92d Cong., 1st Sess., part 7 at 3376, 3389–91 (1971).

**36.** EPA argues, of course, that its regulation of Exxon's deep-well disposal operation supercedes the Alabama Oil and Gas Board's authorization of it. Brief for Respondents at 20 n.7. *See* also note 37 *infra.*

**37.** As we have noted, there is no apparent reason why some deep-well disposal should be subject to state regulation while other is subject to EPA regulation, based simply on whether the person making the deep-well disposal also is making "associated" surface discharges. We already have shown Congress' reluctance to pre-empt state regulation of groundwater. Congress surely would have been all the more reluctant to do so in such a piecemeal fashion as the Administrator argues for here. To accept the Administrator's position necessarily would leave EPA and state regulatory authorities to fight over whether a particular deep-well disposal was, in fact, "associated" with a surface discharge, and hence within EPA's, rather than the state's jurisdiction. We doubt whether Congress would want to exacerbate the friction between the states and EPA that would be

disposal between EPA and the states. Our construction is true, we think, to Congress' intention not to interfere with existing state controls over groundwater "[b]ecause the jurisdiction regarding groundwaters is so complex and varied from State to State." S.Rep.No.414, *supra*, at 73, 2 *Leg.Hist.* 1491. We therefore hold that the Administrator, as an incident to his power under § 402(a) to issue permits authorizing the discharge of pollutants into surface waters, does not have the authority to place conditions in such permits that control the disposal of wastes into deep wells.

Petition Granted.

caused by complete pre-emption of the state's groundwater programs, by building into its scheme continual skirmishes between the states and EPA over which of them has jurisdiction over particular wells.