**UMATILLA WATERQUALITY PROTEC-TIVE ASSOCIATION, INC., an Oregon nonprofit corporation, Plaintiff,**

v.

**SMITH FROZEN FOODS, INC., an Oregon corporation, Defendant.**

**Civil No. 96–657–AS.**

United States District Court, D. Oregon.

April 9, 1997.

Bill Kloos, Johnson, Kloos & Sherton, P.C., Eugene, OR, William A. Sherlock, Rob Jerome, Sherlock & Jerome, Eugene, OR, for Plaintiff.

Tom Lindley, Jerry B. Hodson, Lynne A. Perry, Miller, Nash, Wiener, Hager & Carlson, LLP, Portland, OR, for Defendant.

## PARTIAL JUDGMENT AND ORDER CERTIFYING INTERLOCUTORY APPEAL

ROBERT E. JONES, District Judge.

This is a Clean Water Act (CWA) citizen suit. Plaintiff Umatilla Waterquality Protective Association (UWQPA) is a nonprofit corporation composed of about 12 individuals dedicated to protecting the water quality in Umatilla, Union, Wallowa and Morrow Counties in Oregon. Members of UWQPA reside in Umatilla County in the vicinity of, or own property near, defendant Smith Frozen Foods' vegetable processing facility on Pine Creek in Weston, Oregon. Plaintiff alleges that (1) defendant Smith Frozen Foods' wastewater pipelines periodically fail, discharging pollutants into Pine Creek and in-

terfering with fishing and other water-based recreation around and aesthetic enjoyment of the creek; and (2) that sodium and chloride from defendant's old brine lagoon are leaching into groundwater and then traveling to Pine Creek, constituting an unpermitted continuing discharge of pollutants into the creek.

This case is now before me on the parties' joint motion for immediate certification to the Ninth Circuit of three questions. The parties submit this motion pursuant to 28 U.S.C. § 1292(b). However, before the Ninth Circuit can review a question pursuant to that statute, this court must enter an interlocutory order. 28 U.S.C. § 1292(b); Fed. R.App. P. 5. Therefore, I interpret the parties' motion as a motion for a declaratory judgment with a finding that such order "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation," 28 U.S.C. § 1292(b), and hereby GRANT that motion.

The parties have stipulated to three questions:

1. Are discharges of pollutants into navigable waters via hydrologically connected groundwater subject to regulation under the federal Clean Water Act?

2. If so, do subsoils containing residual pollutants from a former unlined brine pond constitute a point source under the federal Clean Water Act?

3. If so, does the ongoing migration of those pollutants to navigable waters via hydrologically connected groundwater constitute on ongoing discharge within the scope of federal Clean Water Act citizen suit jurisdiction?

My analysis of these questions follows.

## DISCUSSION

**A. Clean Water Act Regulation of Hydrologically–Connected Groundwater**

**1. Water Quality Regulation in Oregon**

■ In 1972, Congress enacted the Clean Water Act (CWA) in order "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To carry out this goal, the Act provides that, "except as in compliance" with its provisions, "the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a). Indeed, the Act established an ambitious if impractical "national goal that the discharge of pollutants into the navigable waters be eliminated by 1985." 33 U.S.C. § 1251(a)(1).

The CWA defines "discharge of a pollutant" to include both "any addition of any pollutant to navigable waters from any point source" and "any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft." 33 U.S.C. § 1362(12). Only the first of these sub-definitions is at issue here.

"Navigable waters," for purposes of the CWA, are "waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). Courts have upheld EPA's broad interpretation of this term to include, essentially, any *surface* water body capable of affecting interstate commerce. *International Paper Co. v. Ouellette,* 479 U.S. 481, 486 n. 6, 107 S.Ct. 805, 808 n. 6, 93 L.Ed.2d 883 (1987) (citing *United States v. Riverside Bayview Homes,* 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985), and 33 U.S.C. § 1362(7)).

Nevertheless, EPA's expanded definition of "waters of the United States" does not make it clear that the CWA covers any kind of *underground* waters. Under EPA's definition, "waters of the United States" include:

(a) All waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;

(b) All interstate waters, including interstate "wetlands;"

(c) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, "wetlands," sloughs, prairie potholes, wet meadows, playa lakes, or natural lakes the use, degradation, or destruction of which would affect or could affect interstate or

foreign commerce including any such waters:

(1) Which are or could be used by interstate or foreign travellers for recreation or other purposes;

(2) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or

(3) Which are or could be used for industrial purposes by industries in interstate commerce;

(d) All impoundments of waters otherwise defined as waters of the United States under this definition;

(e) Tributaries of waters identified in paragraphs (a) through (d) of this definition;

(f) The territorial sea; and

(g) "Wetlands" adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (a) through (f) of this definition.

40 C.F.R. § 122.2. Water treatment systems, including treatment ponds or lagoons, are not waters of the United States if they are "man-made bodies of water which neither were created in waters of the United States (such as a disposal area in wetlands) nor resulted from the impoundment of waters of the United States." *Id.* Thus, the brine pond at issue in the stipulated questions presumably is not itself a navigable water.

The CWA's primary mechanism for regulating the addition of pollutants to navigable waters is the National Pollutant Discharge Elimination System, or NPDES, permit, 33 U.S.C. § 1342(a), which allows regulated discharges of pollutants notwithstanding the Act's general prohibition, so long as the discharger complies with all applicable limitations. 33 U.S.C. § 1342(a)(1). EPA received the original authority to issue such permits, *id.*, but the CWA also allows any state "desiring to administer its own permit program for discharges into navigable waters within its jurisdiction" to apply to EPA for such authority. 33 U.S.C. § 1342(b). EPA has delegated such NPDES permitting authority to Oregon, and Oregon's Department of Environmental Quality (DEQ) and Environmental Quality Commission (EQC) administer Oregon's NPDES permit program. ORS 468B.035.

Oregon water quality law provides that, without a permit, "no person shall:"

(a) Cause pollution of any waters of the state or place or cause to be placed any wastes in a location where such wastes are likely to escape or be carried into waters of the state by any means.

(b) Discharge any wastes into waters of the state if the discharge reduces the quality of such waters below the water quality standards established by rule for such waters by the [Environmental Quality] commission.

ORS 468B.025(1). In addition, statutes require a permit before any person can:

(a) Discharge any wastes into the waters of the state from any industrial or commercial establishment or activity or any disposal system.

(b) Construct, install, modify or operate any disposal system or part thereof or any extension or addition thereto.

(c) Increase in volume or strength any wastes in excess of the permissive discharges specified under an existing permit.

(d) Construct, install, operate or conduct any industrial, commercial, confined animal feeding operation or other establishment or activity or any extension or modification thereof or addition thereto, the operation or conduct of which would cause an increase in the discharge of wastes into the waters of the state or which would otherwise alter the physical, chemical or biological properties of any waters of the state in a manner not lawfully authorized.

(e) Construct or use any new outlet for the discharge of wastes into waters of the state.

ORS 468B.050(1).

"Waters of the state" under Oregon law covers a broader range of waters than the CWA regulates under federal law. Under Oregon statute, "waters of the state" include: lakes, bays, ponds, impounding reservoirs, springs, wells, rivers, streams, creeks, estuaries, marshes, inlets, canals, the Pacific Ocean within the territorial limits of the State of Oregon *and all other bodies of*

*surface or underground waters,* natural or artificial, inland or coastal, fresh or salt, public or private (except those private waters which do not combine or effect a junction with natural surface or underground waters), which are wholly or partially within or bordering the state or within its jurisdiction.

ORS 468B.005(8) (emphasis added).

The most obvious distinction between Oregon law and the CWA is that Oregon law clearly requires some sort of water quality permit for discharges into underground waters, whereas the CWA appears to be confined to discharges that affect surface waters. Indeed, DEQ divides its water quality permitting programs largely on the basis of whether the discharge of pollutants is to surface or to underground waters.

Under DEQ's rules, NPDES permits are required any time a person "discharge[s] pollutants from a point source into navigable waters." OAR 340–45–015(2). DEQ defines "point source" and "pollutant" nearly identically to the CWA. OAR 340–45–010(12), (13). However, "navigable waters" are

all navigable waters of the United States and their tributaries; interstate waters; *intrastate lakes rivers, and streams* which are used by interstate travellers for recreation or other purposes or from which fish or shellfish are taken and sold in interstate commerce or which are utilized for industrial purposes by industries in interstate commerce.

OAR 340–45–010(10) (emphasis added). DEQ's rules do not define "lakes" or "rivers" or "streams," but in common parlance these refer only to surface waters. Thus, DEQ generally issues NPDES permits only for discharges to surface waters. *Compare also* ORS 468B.040 to 468B.095 (regulation of surface water) *with* ORS 468B.150 to 468B.190 (regulation of groundwater).

WPCF permits are Oregon's catch-all category—that is, DEQ issues a WPCF permit for discharges to the broader category of waters of the state when those discharges do not require an NPDES permit. OAR 340–45–015(1), (3); 340–45–025. Therefore, because underground waters are "waters of the state" under Oregon law but are not "naviga-ble waters" as Oregon law defines that term, DEQ has generally regulated discharges of pollutants to groundwater through WPCF, not NPDES, permits.

Different procedures govern the initial applications for WPCF and NPDES permits. *Compare* OAR 340–45–025 and the rules referenced therein *with* OAR 340–45–030, 340–45–035, 340–45–040. Both types of permits, however, generally last five years. ORS 468B.050(1).

I belabor these distinctions because EPA retains oversight jurisdiction of the state's NPDES program. Thus, EPA has a statutory duty to inform the state when that "state is not administering [an approved NPDES program] in accordance with requirements of this section," 33 U.S.C. § 1342(c)(3), and can withdraw such program approval if the state does not correct its administration problems. *Id.* Moreover, the state must notify the Administrator of EPA of each NPDES permit application and permit, and the Administrator can object to any such permit. 33 U.S.C. § 1342(d)(1), (2). Finally, EPA retains enforcement authority even after it has approved a state NPDES program.

Nevertheless, to the court's knowledge, EPA has never objected to Oregon's dual permitting system nor required that a person discharging to groundwater pursuant to a WPCF permit obtain an NPDES permit instead. This dual system, moreover, has been in place since approximately 1973—almost 25 years. *See* OR. LAWS 1973, c. 92, §§ 1, 3.

**2. Federal Interpretations of Groundwater Coverage**

The Ninth Circuit, like EPA, has consistently given a broad definition to "navigable waters" for purposes of the CWA. *Leslie Salt Co. v. Froehlke,* 578 F.2d 742, 754–55 (9th Cir.1978) (holding that "the term 'navigable waters' within the meaning of the [CWA] is to be given the broadest possible interpretation under the Commerce Clause"); *California ex rel. State Water Resources Control Bd. v. Envtl. Protection Agency,* 511 F.2d 963, 964–65 n. 1 (9th Cir.1975), *rev'd on other grounds* 426 U.S. 200, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976). Nevertheless, it has

never addressed the issue of whether the CWA applies to discharges to underground waters under any circumstances.[1]

Other courts are split on this issue. Some courts have held that the CWA does apply to discharges into groundwater when that groundwater affects surface water. *Friends of Santa Fe County v. LAC Minerals*, 892 F.Supp. 1333, 1357–58 (D.N.M.1995) (holding that the Tenth Circuit's decision in *Quivira Mining Co. v. United States Envtl. Protection Agency*, 765 F.2d 126 (10th Cir.1985), *cert. denied*, 474 U.S. 1055, 106 S.Ct. 791, 88 L.Ed.2d 769 (1986), foreclosed "any argument that the CWA does not protect groundwater with some connection to surface waters" because the Tenth Circuit had expansively interpreted the CWA's jurisdictional reach in a non-groundwater context); *Washington Wilderness Coalition v. Hecla Mining Co.*, 870 F.Supp. 983, 989–90 (E.D.Wash.1994) (holding that, although "Congress did not intend to include *isolated* groundwater as part of the 'navigable waters'" that the CWA regulates, the CWA does apply to discharges of pollutants that reach surface waters through groundwater); *Sierra Club v. Colorado Refining Co.*, 838 F.Supp. 1428, 1434 (D.Colo.1993) (holding that discharges into "navigable waters" include discharges that reach navigable waters through groundwater); *McClellan Ecological Seepage Situation v. Weinberger*, 707 F.Supp. 1182, 1193–96 (E.D.Cal.1988), *vacated on other grounds*, 47 F.3d 325 (9th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 51, 133 L.Ed.2d 16 (1995) (noting that although "Congress did not intend to require NPDES permits for discharges of pollutants to isolated groundwater," plaintiff could state a claim if it could "establish that the groundwater is naturally connected to surface waters that constitute 'navigable waters' under the Clean Water Act.").

Other courts disagree, finding that the CWA's permitting provisions do not apply to *any* groundwater. *Town of Norfolk v. United States Army Corps of Engineers*, 968 F.2d 1438, 1451 (1st Cir.1992) (deferring to the Army Corps' definition, which limited CWA coverage to surface waters); *Kelley v. United States*, 618 F.Supp. 1103, 1106–07 (W.D.Mich.1985) (holding that Congress's intent was to leave regulation of contaminated groundwater to the states); *United States v. GAF Corp.*, 389 F.Supp. 1379, 1383–84 (S.D.Tex.1975). In addition, two circuits have not squarely decided the issue but have suggested that groundwater is not subject to the NPDES permit requirement. *Village of Oconomowoc Lake v. Dayton Hudson Corp.*, 24 F.3d 962 (7th Cir.), *cert. denied* 513 U.S. 930, 115 S.Ct. 322, 130 L.Ed.2d 282 (1994) (holding that a possibility of a hydrological connection between groundwater and surface waters was insufficient to justify CWA regulation); *Exxon Corp. v. Train*, 554 F.2d 1310, 1312 n. 1, 1318–19 (5th Cir.1977) (emphasizing that it was not deciding regulatory jurisdiction if pollutants migrated through groundwater to surfaces waters but noting that EPA "disclaims 'jurisdiction and authority to regulate subsurface disposal directly.'").

EPA itself has never promulgated a formal regulation nor issued formal guidance interpreting the CWA to include regulation of groundwater. However, in its discussion of its regulations for storm water discharge NPDES permits, EPA has remarked in response to a rulemaking comment that "this rulemaking only addresses discharges to waters of United States, consequently discharges to ground water are not covered by this rulemaking (unless there is a hydrological connection between the ground water and a nearby surface water body. *See, e.g., Exxon Corp. v. Train*, 554 F.2d 1310, 1312 n. 1 (5th

---

1. In *McClellan Ecological Seepage Situation v. Perry*, 47 F.3d 325 (9th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 51, 133 L.Ed.2d 16 (1995), the Ninth Circuit held that a discharge from inactive pits through perched groundwater, seeps, *and pipes* into surface water was "excluded from federal court jurisdiction" because the system was also subject to a CERCLA cleanup order and the court was unable to fashion any remedy under the CWA "that would not interfere with McClellan's CERCLA groundwater extraction system." *Id.* at 330–31. The court noted that "[t]he source of the alleged surface water contaminants is not dispositive of [plaintiff's] claim," but this statement most directly addresses the fact that the contaminants came from "inactive pits." *Id.* The court did not address the issue of whether the NPDES permit program applies to discharges to groundwater.

Cir.1977); *McClellan Ecological Seepage Situation v. Weinberger*, 707 F.Supp. 1182, 1195–96 (E.D.Cal.1988))." 55 Fed.Reg. 47990, 47997 (Nov. 16, 1990).

Relying on that statement and *Washington Wilderness Coalition*, Magistrate Judge Coffin of the Oregon District Court recently has held that NPDES permits are required for discharges of pollutants from point sources that enter surface water via groundwater. *Friends of the Coast Fork v. Turner*, Civ. No. 95–6105–TC, Order dated July 8, 1996, at 7–8 (filed July 8, 1996). However, like the Washington District Court, he required a specific connection between the groundwater and surface water, not a general hydrological connection between all waters. *Id.* at 8. When such a connection was proven, however, Judge Coffin found that a CWA citizen suit defendant had "violated the CWA by discharging pollutants in the form of leachate and condensate into navigable waters" and that this discharge resulted in part "from leaking of the leachate from the pile of garbage and lagoons into the groundwater which is hydrologically connection to the surface waters of the Camas Swale Creek." *Friends of the Coast Fork v. County of Lane, Oregon*, Civ. No. 95–6105–TC, Findings of Fact and Conclusions of Law, at 6 (Jan. 31, 1997).

### 3. Conclusion: The NPDES Program Does *Not* Apply to Groundwater

I find that I disagree with the Eastern District of Washington and Magistrate Judge Coffin. Although the CWA's NPDES program *should* apply to groundwater to adequately protect surface water, I conclude that the law as written, as intended by Congress, and as applied in Oregon for over two decades does not regulate even hydrologically-connected groundwater.

First, I note that when Congress wanted certain provisions of the CWA to apply to groundwater, it stated so explicitly. Thus, it commanded that "[t]he Administrator shall * * * prepare or develop comprehensive programs for preventing, reducing, or eliminating the pollution *of the navigable waters and ground waters* and improving the sanitary condition *of surface and underground waters*." 33 U.S.C. § 1252(a). Similarly, the

Administrator shall "establish, equip, and maintain a water quality surveillance system for the purpose of monitoring the quality *of the navigable waters and ground waters and the contiguous zone and the oceans * * * .*" 33 U.S.C. § 1254(a)(5). In contrast, section 1342, which establishes the NPDES permitting system, makes no reference to groundwater.

Second, the quoted references strongly indicate that Congress considered "ground waters" to be a different category of waters from "navigable waters." Indeed, throughout the CWA, Congress appeared to have four categories of waters in mind—"navigable waters," the contiguous zone, the ocean, and "ground waters." Only the first three of these, moreover, are included within the definition of "discharge of a pollutant," 33 U.S.C. § 1362(12), indicating that Congress did *not* consider discharges to groundwater to be discharges that would trigger the NPDES permit requirement. *See* 33 U.S.C. § 1342(a)(1).

Third, the CWA's legislative history suggests that Congress did not intend to regulate groundwater in any form. As the Eastern District of California has noted:

The report accompanying the Senate version of the Clean Water Act stated:

> Several bills pending before the Committee provided authority to establish Federally approved standards for groundwaters which permeate rock, soil and other surface formations. Because the jurisdiction regarding groundwaters is so complex and varied from State to State, the Committee did not adopt this recommendation.

S. Rep. No. 414, 92d Cong., 1st Sess. 73 (1971), U.S.Code Cong. & Admin. News 1972, pp. 3668, 3749, *reprinted in* 2 Congressional Research Service of the Library of Congress, A Legislative History of the Water Pollution Control Act Amendments of 1972, 93d Cong., 1st Sess., at 1491 (Comm. Print 1973) (hereinafter "Leg. Hist.").

In addition, the House specifically rejected an amendment introduced by Rep. Aspin that would have brought groundwa-

ter within the permitting and enforcement sections of the bill. 118 Cong.Rec. 10,669 (1972), 1 Leg. Hist. 597. In opposing this amendment, Rep. Clausen, a sponsor of the House bill, stated:

Mr. Chairman, in the early deliberations within the committee which resulted in the introduction of H.R. 11896, a provision for ground waters, similar to that suggested by the gentleman from Wisconsin, was thoroughly reviewed and it was determined by the committee that there was not sufficient information on ground waters to justify the types of controls that are required for navigable waters.

118 Cong. Rec. 10,667 (1972, 1 Leg. Hist. 590–91 (remarks of Rep. Clausen). Thus, both the Senate and the House specifically rejected attempts to require permits for discharges to groundwater under the NPDES program. *McClellan Ecological Seepage Situation v. Weinberger,* 707 F.Supp. at 1194). The failure of a proposed amendment "strongly militates against a judgment that Congress intended a result that it expressly declined to enact." *Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 200, 95 S.Ct. 392, 401, 42 L.Ed.2d 378 (1974).

Fourth, EPA has offered no formal or consistent interpretation of the CWA that would subject discharges to groundwater to the NPDES permitting requirement. I note that an agency's interpretation of a statute that it administers is entitled to great deference. *Chemical Manufacturers Ass'n v. Natural Resources Defense Council,* 470 U.S. 116, 125, 105 S.Ct. 1102, 1107–08, 84 L.Ed.2d 90 (1985); *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). Here, however, the most formal interpretations from EPA indicate that the NPDES program does *not* apply to discharges to groundwater. The Office of General Counsel advised EPA that:

Section 402 [33 U.S.C. § 1342] authorizes the Administrator to issue a permit 'for the discharge of a pollutant.' Under § 502(12) the term 'discharge of a pollutant' is defined so as to include only discharges into navigable waters (or the contiguous zone of the ocean). *Discharges into ground waters are not included.* Accordingly, permits may not be issued, and no application is required, unless a discharge into navigable waters is proposed or is occurring.

Opinion, Office of General Counsel (December 13, 1973), *as reprinted in Exxon Corp. v. Train,* 554 F.2d at 1321 n. 21 (emphasis added). Moreover, EPA twice promulgated regulations restricting its authority over groundwater in accordance with this opinion. 38 Fed.Reg. 13,528 (May 22, 1973), *codified as* 40 C.F.R. § 125.26(a)(1) (1977); 44 Fed. Reg. 32,854, 32,870 (June 7, 1979). Courts interpreting the CWA's NPDES permit program as applying to hydrologically-connected groundwater have uniformly failed to address this interpretive history. *Friends of Santa Fe County,* 892 F.Supp. at 1357–58; *Washington Wilderness Coalition v. Hecla Mining Co.,* 870 F.Supp. at 990–91; *Sierra Club v. Colorado Refining Co.,* 838 F.Supp. at 1432–34; *McClellan Ecological Seepage Situation v. Weinberger,* 707 F.Supp. at 1195–96.

As noted, EPA has not since promulgated regulations asserting that hydrologically connected groundwater can be subject to NPDES permitting. Nor, apparently, has it published official guidance on this subject. Given the General Counsel's interpretation that the NPDES permitting program does *not* apply to ground water and EPA's previous regulatory activity confirming this interpretation, I do not believe that EPA's recent parenthetical comment in its discussion of storm water permit application regulations, without more, should be accorded the power to reshape the CWA's plain language and almost twenty-five years of water quality regulation in Oregon.[2]

Fourth, in contrast to EPA, Oregon's DEQ, the agency currently administering the CWA in Oregon, has clearly interpreted that Act's NPDES program as *not* applying to discharges to groundwater. The U.S. Su-

---

**2.** Of course, if EPA in the future formally interprets the CWA so as to bring hydrologically-connected groundwater explicitly within the ambit of NPDES permitting, this court will accord that formal interpretation normal *Chevron* deference.

**1320**

preme Court has noted that state standards implementing the CWA "are part of the federal law of water pollution control" and "have a federal character." *Arkansas v. Oklahoma,* 503 U.S. 91, 109–10, 112 S.Ct. 1046, 1058–59, 117 L.Ed.2d 239 (1992). Moreover, I emphasize again that EPA has approved Oregon's NPDES permit program and, implicitly, the regulatory distinction between surface waters and ground water of which it is a part. EPA has apparently not seen fit to require Oregon to modify its NPDES permit program, and DEQ's interpretation of the CWA is reasonable in light of Congress's language, the Act's legislative history, and EPA's regulatory actions. Thus, while Oregon's interpretation of the CWA is by no means controlling here, that interpretation in combination with EPA's initial approval and continued unwillingness to order a modification lends weight to my conclusion that the CWA's NPDES program does not apply to any discharges to groundwater.

Finally, I am mindful of the practical consequences to water quality regulation if I were to include hydrologically-connected groundwater within the NPDES permit program. Both DEQ and its WPCF permittees have relied on the surface water/groundwater permitting distinction to assess compliance with both Oregon and federal law for over two decades. In addition, although in some cases, such as this one, the fact that groundwater connects to surface water is relatively easy to discern, such connections are often not obvious. The rule that the Eastern District of Washington and Magistrate Judge Coffin would follow would add a new level of uncertainty and expense to NPDES permitting and would expose potentially hundreds of WPCF permittees to current or future litigation and legal liability if they or DEQ has happened to make the "wrong" choice about which kind of permit discharges to groundwater require.

Again, while these considerations are not controlling and would not signify if Congress or EPA had clearly spoken to the issue of groundwater coverage, nothing in the Act itself, in the legislative history, or in EPA's actions or regulations requires or even encourages what is for Oregon essentially a new and significant interpretation of the NPDES permit program provisions. I therefore hold that discharges of pollutants into groundwater are not subject to the CWA's NPDES permit requirement even if that groundwater is hydrologically connected to surface water.

**B. Leaking Ponds as Point Sources**

My decision that the CWA does not regulate groundwater that is hydrologically connected to surface water makes resolution of the parties' second and third questions technically unnecessary. However, in the event that the Ninth Circuit accepts the parties' interlocutory appeal, I will nevertheless answer the second and third questions so that the Ninth Circuit will have a full district court opinion to review.

Under the Act, a "point source" is "any discernible, confined and discrete conveyance," but "does not include agricultural stormwater discharges and return flows from irrigated agriculture." 33 U.S.C. § 1362(14). The Ninth Circuit has given this definition a broad scope. In *Trustees for Alaska v. Envtl. Protection Agency,* 749 F.2d 549 (9th Cir.1984), for example, it emphasized that "point and nonpoint sources are not distinguished by the kind of pollution they create or by the activity causing the pollution, but rather by whether the pollution reaches the water through a defined, discrete conveyance." *Id.* at 558. *See also Beartooth Alliance v. Crown Butte Mines,* 904 F.Supp. 1168, 1173 (D.Mont.1995) (holding that nonpoint sources are "limited to uncollected runoff water that is difficult to ascribe to a single polluter.").

In *Trustees for Alaska,* moreover, the Ninth Circuit expressly adopted the Tenth Circuit's reasoning in *United States v. Earth Sciences, Inc.,* 599 F.2d 368 (10th Cir.1979), that overflowing or leaking mining sumps were point sources. *Trustees for Alaska,* 749 F.2d at 558. The Tenth Circuit in *Earth Sciences* reasoned as follows:

> When [the sump] fails because of flaws in the construction or inadequate size to handle the fluids utilized, the resulting discharge, whether from a fissure in the dirt berm or overflow of a wall, the escape of

liquid from the confined system is from a point source. Although the source of the excess liquid is rainfall or snow melt, this is not the kind of general runoff considered to be from nonpoint sources under the FWPCA.

*Earth Sciences,* 599 F.2d at 374. Thus, the Ninth Circuit has accepted that escape of liquid from a confined system through dirt is a point source.

In addition, in *Trustees for Alaska* the Ninth Circuit cited the Fifth Circuit case of *Sierra Club v. Abston Construction Co.,* 620 F.2d 41 (5th Cir.1980), with approval. *Trustees for Alaska,* 749 F.2d at 558. In *Abston Construction,* the Fifth Circuit noted that "[g]ravity flow, resulting in a discharge into a navigable body of water, may be part of a point source discharge if the [discharger] at least initially collected or channeled the water and other materials." *Abston Construction,* 620 F.2d at 44–45. Thus, in accepting the Tenth and Fifth Circuit's reasoning, the Ninth Circuit has indicated that the discharger does not need to be actively conveying the pollutants to navigable waters—only that the discharger collected the discharged material prior to the discharge.

Here, the parties' stipulated question asks if the discharge of residual pollutants purposefully collected in an unlined brine pond can constitute a discharge of pollutants from a point source. The unlined brine pond is a confined and discrete conveyance within the CWA's definition of "point source," readily identifiable to a single source. The fact that those pollutants now migrate through dirt with the help of water sources such as rain water and gravity that are not under the discharger's controldoes not change the old brine pit's status. Therefore, if the Ninth Circuit should conclude that discharges of pollutants through hydrologically-connected groundwater are subject to the NPDES permit requirement, the residues at issue here would be a point source.

## C. Ongoing Migration as an Ongoing Discharge

▮ The CWA allows citizen suits against any person alleged "to be in violation" of the Act. 33 U.S.C. § 1365(a). The U.S. Supreme Court has read this language literally, so that a citizen suing for violations of the CWA must be able to allege that those violations are ongoing. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.,* 484 U.S. 49, 58–64, 108 S.Ct. 376, 381–85, 98 L.Ed.2d 306 (1987).

▮ Specifically, the Supreme Court has held that section 1365 of the CWA "does not permit citizen suits for wholly past violations." *Id.* at 64, 108 S.Ct. at 385. However, section 1365 "confers jurisdiction over citizen suits when the citizen-plaintiffs make a good-faith allegation of continuous or intermittent violation * * *." *Id.* Thus, citizen-plaintiffs do not have to *prove* their allegations for jurisdiction to attach. *Id.* Instead, summary judgment is the proper procedure for defendants to use to establish that such allegations are in fact untrue. *Id.* at 65–66, 108 S.Ct. at 385–86. In addition, claims can become moot if, after a good-faith suit is filed, it becomes " 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.' " *Id* at 66, 108 S.Ct. at 386 (quoting *United States v. Concentrated Phosphate Export Ass'n, Inc.,* 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968)).

▮ Shortly after the Supreme Court decided *Gwaltney,* the Ninth Circuit agreed with the Fourth Circuit "that a citizen plaintiff may prove ongoing violation 'either (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations.' " *Sierra Club v. Union Oil Co. of California,* 853 F.2d 667, 671 (9th Cir.1988) (quoting *Chesapeake Bay Found. v. Gwaltney,* 844 F.2d 170, 171–72 (4th Cir.1988) (hereinafter *"Gwaltney II"*)). In addition, the Ninth Circuit agreed that " '[i]ntermittent or sporadic violations do not cease to be ongoing until the date when there is *no real likelihood of repetition.*' " *Id.* (quoting *Gwaltney II,* 844 F.2d at 172) (emphasis added by Ninth Circuit). The focus for the court is " '*whether the risk of defendant's continued violation had been completely eradicated* when citizen-plaintiffs filed suit.' " *Id.* (quot-

ing *Gwaltney II*, 844 F.2d at 172) (emphasis added by Ninth Circuit).

Here, the parties' stipulated question assumes that the migration of pollutants from the brine pond residue to navigable waters is ongoing. I have already concluded that the brine pond would be a point source *if the groundwater connection were sufficient to establish a discharge to navigable waters.* Thus, the question remaining is whether the ongoing migration of pollutants, when no more pollutants are being added to the old brine pond, is a violation of the CWA.

The CWA states clearly that, except as otherwise provided in the Act, "the discharge of any pollutant by any person shall be unlawful." 33 U. § .C. § 1311(a). The "discharge of a pollutant," as noted above, is "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). "Pollutant" is a broad term, meaning:

> dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, *chemical wastes,* biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and *industrial, municipal, and agricultural waste* discharged into water.

33 U.S.C. § 1362(6) (emphasis added). Thus, the brine residues are pollutants both as chemical wastes and as industrial wastes. *See Hudson River Fishermen's Ass'n v. City of New York,* 751 F.Supp. 1088, 1101 (S.D.N.Y.1990), *aff'd* 940 F.2d 649 (2d Cir. 1991) (holding that chlorine residuals were "pollutants" under the CWA).

If the Ninth Circuit finds that discharges in hydrologically-connected groundwater constitutes a discharge into navigable waters, then the *focus of whether there is an ongoing* violation under the definition of "discharge of a pollutant" is the addition of pollutants to *navigable waters—not* the addition of pollutants to the point source. *See* 33 U.S.C. § 1362(12).

It has long been understood that. the discharger need not be in control of the discharge to navigable waters for a violation of the CWA to occur; indeed, many violations occur because of spills, floods, breaking

pipes, and so on. *See SED, Inc. v. City of Dayton,* 519 F.Supp. 979, 989 (D.Ohio 1981) (holding that the discharge of pollutants extends to indirect, accidental, and unintentional additions of pollutants to navigable waters). As discussed above, moreover, the Ninth Circuit has approved subjecting discharges of pollutants to the NPDES permit requirement when the discharger simply collects pollutants that are later carried to navigable waters by rain water or gravity flow. The focus is thus on whether the pollutants reach navigable waters from a point source.

By extension, a discharge of pollutants is ongoing if the pollutants continue to reach navigable waters, even *if the discharger is no* longer adding pollutants to the point source itself. In the terms of *Sierra Club v. Union Oil Co.,* the risk of continued violation has not been eradicated. \*853 F.2d at 671. *See also McClellan Ecological Seepage Situation,* 47 F.3d at 330–31 (noting that the fact that pollutants came from inactive pits was not dispositive of the action); *Werlein v. United States,* 746 F.Supp. 887, 896–97 (D.Minn. 1990), *class cert. vacated* 793 F.Supp. 898 (D.Minn.1992) (holding that when toxic waste migrates to a waterway over time, there is ongoing pollution of that waterway for CWA purposes, even though all of the contaminants were dumped years before).

Therefore, if a discharge through hydrologically-connected groundwater is subject to the NPDES permit requirement, ongoing migration of pollutants from an old brine pit's residues through groundwater to surface water without an NPDES permit would constitute an ongoing violation of the CWA. As such, the district court's jurisdiction would be proper under *Gwaltney.*

**D. Interlocutory Appeal**

▆ The parties have moved for this declaratory judgment to be certified for interlocutory appeal to the Ninth Circuit. Under federal statute,

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion

and that an immediate appeal from the order may materially advance the termination of the litigation, he shall so state in writing such order.

28 U.S.C. § 1292(b). This declaratory judgment is not otherwise subject to interlocutory appeal because it does not involve an injunction, a receivership, or an admiralty case. *See* 28 U.S.C. § 1292(a). The issues discussed above are controlling questions of law for the largest part of this case and, as the discussion above makes obvious, these issues—especially the first—have been subject to considerable debate but have no clear resolution in this circuit. I also note that, with this judgment, there is a split of authority on the groundwater question among the district courts within the Ninth Circuit. Immediate appeal of this order may materially advance the termination of this litigation because the parties are likely to appeal this case in any event and guidance from the Ninth Circuit now will greatly help to focus and limit the plethora of legal issues and factual arguments that the parties will otherwise have to advance in order to present their cases.

### E. Stay of Pending Action

Normally, interlocutory appeals pursuant to section 1292 do not stay the district court proceedings. Given the importance of the issues decided here to the rest of this case, however, I hereby stay these proceedings until either: (1) the Ninth Circuit decided the interlocutory appeal; (2) the Ninth Circuit declines to exercise its discretion to hear the interlocutory appeal; or (3) one or both of the parties informs this court that no interlocutory appeal was taken.

IT IS SO ORDERED.