Carmen Marrero HERNANDEZ, et al., Plaintiffs,

v.

**ESSO STANDARD OIL COMPANY (PUERTO RICO); Carlos Rodriguez Perez, Defendants.**

**Civil No. 03–1485 (GAG)(JA).**

United States District Court, D. Puerto Rico.

March 2, 2009.

José A. Hernández–Mayoral, Manuel San Juan, Juan H. Saavedra Castro, Rafael E. Garcia Rodón, San Juan, PR, for Plaintiff or Petitioner.

John F. Nevares, Lawrence Riff, Jason Levin, San Juan, PR, for Defendant or Respondent.

## *ORDER*

GUSTAVO A. GELPI, District Judge.

This matter is before the court on defendant Esso's series of motions regarding jury trial on plaintiffs federal claims (Docket Nos. 981, 995, 1001, 1004, 1005). Esso moves for a bench trial as to plaintiffs' claims under the Resource Conservation and Recovery Act of 1976, 42 U.S.C. §§ 6991 et seq. ("RCRA"), and the Clean Water Act, 33 U.S.C. §§ 1251 et seq. ("CWA").[1] Defendant relies on various arguments, but the main thrust of its contention is that civil penalties do not proceed in this case under those statutes. Since under *Tull v. United States,* 481 U.S. 412, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987), the right to jury trial attaches as to liability only when civil penalties are implicated, if the imposition of penalties does not proceed under RCRA or CWA, plaintiffs have no right to a trial by jury. As to CWA, Esso also argues that, as a matter of law and on the facts of this case, plaintiffs cannot prove liability because CWA does not regulate the contamination of groundwater and, thus, they have no right to trial

by jury under that Act. Plaintiffs have responded to Esso's motion (Docket No. 1016). The court considers each of Esso's averments separately.

## I. Civil Penalties and the Right to Trial by Jury under RCRA

Plaintiffs have asserted two causes of action under RCRA's citizen's suit provision: an enforcement action and an imminent and substantial endangerment action. 42 U.S.C. §§ 6972(a)(1)(A) and (B), respectively. Esso argues that civil penalties are only appropriate for enforcement actions[2] if the statute to be enforced falls under RCRA Subchapter III/C related to the treatment, storage, and disposal of presently existing *hazardous substances.* See *College Park Holdings, LLC v. Racetrac Petroleum, Inc.,* 239 F.Supp.2d 1334, 1348–49 (N.D.Ga.2002) (citing *Dydio v. Hesston Corp.,* 887 F.Supp. 1037, 1039 n. 2 (N.D.Ill. 1995)). (Dkt. 981 at 2–4). This court agrees. The citizen's suit provision of RCRA provides that "[t]he district court shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce the permit, standard, regulation, condition, requirement, prohibition, or order, referred to in paragraph (1)(A) [ . . . ] and to apply any appropriate civil penalties under section 6928(a) and (g) of this title." 42 U.S.C. § 6972(a). Sections 6928(a) and (g) appear

1. On February 25, 2009, plaintiffs agreed in open court to a bench trial as to their claims under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601 et seq ("CERCLA").

2. Esso presented in one of its motions case law to the effect that civil penalties are not appropriate or available for imminent and substantial endangerment claims under RCRA. *See Village of Riverdale v. 138th Street Joint Venture,* 527 F.Supp.2d 760, 768 (N.D.Ill.2007) (citing *Burnette v. Carothers,*

192 F.3d 52, 57–58 (2nd Cir.1999)). The court is persuaded by this case law and rules that the question of whether or not the contamination at La Vega presents an imminent and substantial endangerment to health or the environment will go to the bench. In light of this, and the court's additional rulings, *infra,* it notes that the parties will be in a position to propose jury instructions in order to clearly delineate for the jury its circumscribed adjudicative role in this case.

in RCRA Subchapter III, which, in the words of the *College Park* court, "is distinct from Subchapter IX," the provisions governing USTs, 42 U.S.C. secs. 6991 et seq. "Subchapter IX has its own set of enforcement provisions, including the ability to assess civil penalties under certain circumstances. 42 U.S.C. § 6991e(d). But, the citizen suit provision in 6972(a) only authorizes a district court to apply civil penalties under Subchapter III, not Subchapter IX. The plain language of the statute does not authorize this court to award civil penalties under section 6991e(d)(2) in a citizen suit [...]." *Id.* at 1349 (citing *Dydio*, 887 F.Supp. at 1039 n. 2).

Esso contends that plaintiffs filed suit alleging violations of RCRA Subchapter IX, but that they do not have a Subchapter III claim because the court already ruled (Docket. No. 886) that plaintiff's claims as to hazardous waste are precluded for not having been identified in the prelitigation notice or the complaint. The court has considered this argument and has ruled against it. *See* Docket No. 1006. Plaintiffs have an RCRA Subchapter III claim and it is properly before the court. Having determined that plaintiffs have alleged liability under Subchapter III of RCRA, under the *College Park* theory, the imposition of civil penalties can proceed.[3] Thus, trial by jury is appropriate for the RCRA enforcement claim in this action.

Alternatively, defendant Esso argues that because its gasoline waste does not meet RCRA's exceptionally complex definition of "hazardous," the activity at issue in this case cannot violate Subchapter III. Esso does not dispute that gasoline that leaks into soil can create RCRA solid waste, but argues that such waste is not classified as "hazardous" unless it has been listed by the EPA as hazardous, pursuant to 40 C.F.R. § 261.30, or unless the waste exhibits any of the characteristics identified in 40 C.F.R. §§ 261.20 through 261.24: ignitability, corrosivity, reactivity, or toxicity. Because gasoline and diesel are not listed by the EPA as hazardous wastes, what is at issue here is whether or not the gasoline and diesel involved in this case exhibit any of the characteristics mentioned above, specifically toxicity. In order to make this determination, Esso accurately points the court to the EPA's regulation at 40 C.F.R. § 261.4(b)(10), which establishes that petroleum-contaminated media and debris that "are subject to the corrective action regulations under part 280 [of title 40 of the Code of Federal Regulations]" (related to the operation of USTs) shall not be considered *hazardous* wastes under RCRA if they "fail the test for the Toxicity Characteristic of § 261.24 (Hazardous Waste Codes D018 through D043 only)." Section 261.24 of title 40 provides as follows:

> A solid waste (except manufactured gas plant waste) exhibits the characteristic of toxicity if, using the Toxicity Characteristic Leaching Procedure, test Method 1311 in "Test Methods for Evaluating Solid Waste, Physical/Chemical Methods," EPA Publication SW–846, as incorporated by reference in § 260.11 of this chapter, the extract from a representative sample of the waste contains any of the contaminants listed in table 1 at the concentration equal to or greater than the respective value given in that table.

*Id.*

Benzene, lead, and trichloroethylene, which are among the contaminants alleged by plaintiffs to be present at La Vega as a result of the UST leakages, *see* Docket

---

**3.** The court notes that counsel for plaintiffs has filed a Motion Regarding Specific Statute

and Regulations Violated by Esso Under RCRA Penalty Provisions, Docket No. 1017.

Nos. 200–2 and 984, appear among the contaminants listed in "table 1." *Id.* What defendant Esso argues is that plaintiffs have no test data, no expert testimony, and no other evidence showing that such contaminants are present at La Vega above EPA's toxicity threshold. This might very well be the case. However, Esso is urging the court to consider an argument that is to be decided on the evidence, before plaintiffs have the chance to conclude their case-in-chief. This request is, therefore, premature. The court shall reserve its ruling as to whether or not plaintiffs' evidence is sufficient to support a finding of toxicity upon defendant Esso's filing of a Rule 50 motion.[4]

## II. Civil Penalties and the Right to Trial by Jury under CWA

First, the court addresses the argument made by Defendant at Docket No. 981 that, because plaintiffs made no mention of Section 1311(a) of the CWA, 33 U.S.C. § 1311(a), in their prelitigation notice or complaint, it would be unjust and a violation of Esso's due process rights to permit the imposition of penalties under that section at this stage in the proceedings. *See* Docket No. 981 at 4–5. Defendant brought this argument because the court indicated in its opinion and order denying summary judgment that there was a triable issue of fact as to whether Esso violated section 1311(a) of the CWA by per-

mitting "the addition of any pollutant to navigable waters from a point source." *See Marrero Hernandez v. Esso,* 597 F.Supp.2d 272, 288 (D.P.R.2009), Docket No. 974, 19–20. Esso incorrectly posists that it was given no notice as to the possibility of imposition of penalties under 33 U.S.C. § 1311(a). Plaintiffs specifically mention 33 U.S.C. § 1319(d) in their amended complaint and that section, in turn, lists 33 U.S.C. § 1311 as one of seven sections in the CWA, which if violated may entail the imposition of civil penalties. Plaintiffs did not have to further pinpoint in their complaint the particular subsections of CWA under which penalties would be sought, since the statute they *did* cite makes specific mention of several such dispositions. In the future, the court shall disregard any similar arguments made by Esso, to the effect that plaintiffs were obliged to cite *dependent sections* mentioned within statutes already adequately invoked by plaintiffs as a source of liability.

The court now turns to Esso's contention that there is no right to jury trial under the CWA in this case because there can be no CWA violation where the theory of liability is based on proof that gasoline from the USTs owned by Esso continues to migrate through the groundwater below the La Vega station into the Piñonas River.[5] Esso argues that under First Circuit

4. At that point, defendant Esso shall provide the court with its argument as to the issue brought by plaintiffs in their Informative Motion Regarding the Proper Allocation of the Burden of Proving the RCRA Petroleum Exclusion in 40 C.F.R. § 261.4(b)(10), Docket No. 1021.

5. Plaintiffs retorted in open court by alleging that the contamination of the Piñonas River has occurred by other means, besides migration through groundwater. Esso filed an informative motion (Docket No. 1004) arguing the impropriety of plaintiffs' new legal theory

at this stage in the proceedings. After reviewing the amended complaint and plaintiffs' contention interrogatory responses, the court concludes that Esso is not entirely correct in its assertion that this theory is entirely new. For example, plaintiffs stated in their contention interrogatory responses that "fuel [from the La Vega station] reaches groundwater which is hydrologically connected to the river. In addition, fuel may have reached the river through the stations [sic] storm sewer system." Docket No. 1004–2, 17–18. Therefore, the court concludes that it would not be

authority, the CWA does not regulate discharges into groundwater, whether or not those discharges may migrate to navigable waters. Esso claims that under *Town of Norfolk v. United States Army Corps of Engineers*, 968 F.2d 1438 (1st Cir.1992), groundwater is not considered "waters of the United States." Esso misinterprets the holding of this case. In *Town of Norfolk*, the court upheld a determination made by the Army Corps of Engineers to issue a permit under Section 404 of the CWA to allow the Massachusetts Water Authority to place landfill in an artificial wetland. In doing so, the court noted that 40 C.F.R. § 230.3(s)(3) "does not indicate whether groundwater constitutes 'waters of the United States,' [though] the Corps has interpreted this definition to refer only to surface waters." *Town of Norfolk*, 968 F.2d at 1450. The court goes on to state the following: "[a]lthough other courts have questioned whether the term 'waters of the United States' should include groundwaters connected to surface waters—we agree with the Corps that since such a determination ultimately involves an ecological judgment about the relationship between surface waters and groundwaters, it should be left in the first instance to the discretion of the EPA and the Corps." *Id.* at 1451 (citations omitted).

As plaintiffs point out, the First Circuit's position is not that groundwater is categorically excluded from consideration as "waters of the United States," but rather that such a determination requires an "ecological judgment," to be made according to the particular characteristics of the site in question. *See Id.* (citing *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 134, 106 S.Ct. 455, 88

L.Ed.2d 419 (1985) (deference should be given to "the Corps' ecological judgment about the relationship between waters and their adjacent wetlands")). In *Town of Norfolk*, the EPA and Army Corps of Engineers had analyzed the site and authorized a permit, having concluded that the impact of the landfill on adjacent waters would be minimal and that the nearest water wells were located more than two miles from the proposed landfill site and separated by soils of low permeability. *Id.* at 1443, 1446. That case did not involve, as does the instant action, a claim that *unpermitted* wastes are reaching "waters of the United States" by migration through groundwater that is hydrologically connected to an adjacent river. Therefore, *Town of Norfolk* is not dispositive of the issue at hand.

A review of the case law addressing the regulation of groundwater under the CWA reveals that "*isolated/tributary groundwater*," such as confined wells, has been unequivocally excluded from the Act by most courts. *See, e.g., Exxon Corp. v. Train*, 554 F.2d 1310, 1312 n. 1 (5th Cir.1977) (expressly noting that it did not consider whether or not wastes disposed of into wells that "migrate" from groundwaters back into surface waters are within the EPA's regulatory jurisdiction under CWA); *United States v. GAF Corp.*, 389 F.Supp. 1379, 1381–83 (S.D.Tex.1975) ("[t]he disposal of chemical wastes into the underground waters *which have not been alleged to flow into or otherwise affect surface waters* does not constitute a 'discharge of pollutant' within the meaning of 1311(a).") (emphasis added); *Washington Wilderness Coalition v. Hecla Mining Co.*, 870 F.Supp. 983, 989–90 (E.D.Wash.1994) ("the legislative history of the CWA dem-

unduly prejudicial to Esso to allow plaintiffs to proceed on alternate theories, if they have

been properly advanced.

onstrates that Congress did not intend that discharges to isolated groundwater be subject to permit requirements."). However, these cases do not preclude the act from applying to the regulation of "tributary groundwater," such as in the present case, which allegedly migrates from groundwater back into surface water. There is, in fact, a split among courts as to the present question.

One view is that Congress intended to regulate the discharge of pollutants that could affect surface waters of the United States, whether it reaches the surface water directly or through groundwater. *See U.S. Steel Corp. v. Train,* 556 F.2d 822, 852 (7th Cir.1977); *McClellan Ecological Seepage Situation ("MESS") v. Weinberger,* 707 F.Supp. 1182, 1196 (E.D.Cal. 1988), *rev'd on other grounds,* 47 F.3d 325 (9th Cir.1995); *Sierra Club v. Colorado Refining Co.,* 838 F.Supp. 1428 (D.Colo. 1993); *Washington Wilderness Coalition,* 870 F.Supp. at 990; *Idaho Rural Council v. Bosma,* 143 F.Supp.2d 1169, 1180 (D.Idaho 2001). The rationale supporting this conclusion is simple and persuasive: "since the goal of the CWA is to protect the quality of surface waters, any pollutant which enters such waters, whether directly or through groundwater, is subject to regulation by NPDES permit." *Washington Wilderness Coalition,* 870 F.Supp. at 990. "Stated even more simply, whether pollution is introduced by a visible, aboveground conduit or enters the surface water through the aquifer matters little to the fish, waterfowl, and recreational users which are affected by the degradation to our nation's rivers and streams." *Idaho Rural Council,* 143 F.Supp.2d at 1179–80.

Other courts, on the other hand, conclude that the possibility of a hydrological connection between ground and surface waters is insufficient to justify CWA regulation. *See Village of Oconomowoc Lake v. Dayton Hudson Corp.,* 24 F.3d 962, 965–66 (7th Cir.1994); *Kelley v. United States,* 618 F.Supp. 1103 (W.D.Mich.1985); *Umatilla Waterquality Protective Assoc., Inc. v. Smith Frozen Foods, Inc.,* 962 F.Supp. 1312, 1318 (D.Or.1997). Esso specifically cites *Oconomowoc Lake* in support of its theory, that the CWA does not regulate discharges to "hydrologically connected" groundwater. In *Oconomowoc Lake,* the Seventh Circuit concluded that "[n]either the Clean Water Act nor the EPA's definition [of waters of the United States] asserts authority over ground waters, just because these may be hydrologically connected with surface waters." *Id.* at 965.[6] The Seventh Circuit reached this conclusion based largely on the legislative history of the CWA, as do all other courts that espouse the same theory. These courts point out that in other provisions of the CWA, Congress clearly included groundwater when they intended to do so, and that Congress considered groundwaters to be a category of waters distinct from "navigable waters." *Umatilla,* 962 F.Supp. at 1318. They indicate that Congress specifically chose not to regulate groundwater because "the jurisdiction regarding groundwaters is so complex and varied from State to State." *Idaho Rural Council,* 143 F.Supp.2d. at 1180 (citing *Umatilla,* 962 F.Supp. at 1318) (quoting from S.Rep. No. 414 92nd Cong., 1st Sess. 73 (1971), U.S.Code Cong. & Admin.News 1972, p. 3668, reprinted in 2 Congressional Research Service of the Library of Con-

**6.** Curiously, however, *Oconomowoc Lake* makes no reference to the Seventh Circuit decision in *United States Steel Corp. v. Train,* 556 F.2d 822, 852 (7th Cir.1977), which held that the EPA is authorized to regulate tributary groundwater, "at least when the regulation is undertaken in conjunction with limitations on the permitee's discharges into surface waters."

gress, A Legislative History of the Water Pollution Control Amendments of 1972, 93d Cong., 1st Sess., at 1491 (Comm. Print. 1973)). Therefore, "[t]he omission of ground waters from the regulations is not an oversight," assert these courts. *Oconomowoc Lake,* 24 F.3d. at 965. Finally, they attach significance to the fact that "[o]n several occasions the EPA has noted the potential connection between ground waters and surface waters, but it has left the regulatory definition alone." *Id.* "The EPA has offered no formal or consistent interpretation of the CWA that would subject discharges to groundwater to the NPDES permitting requirement." *Umatilla,* 962 F.Supp. at 1318.

The court agrees that this interpretative history establishes that when Congress enacted the CWA, it decided not to attempt the general regulation of discharges to groundwater. However, the decision not to comprehensively regulate groundwater as part of the CWA does not require the conclusion that Congress intended to exempt groundwater from all regulation, particularly when the introduction of pollutants into the groundwater adversely affects adjoining river surface water. For this reason, and because it finds that First Circuit authority does not preclude its ruling, the court holds that the CWA extends federal jurisdiction over groundwater that is hydrologically connected to surface waters that are themselves waters of the United States.[7] Following the First Circuit's reasoning in *Town of Norfolk,* there is a factual determination to be made as to the relationship between the groundwater below the La Vega station and the surface waters of the Piñonas River, which may lead the fact finder to conclude that contamination of the groundwater has an adverse impact on waters of the United States. Therefore, the court rejects Esso's argument that plaintiffs have no right to jury trial as to their claims under the CWA.

## III. Conclusion

For the foregoing reasons, the court **DENIES** Esso's motion for a bench trial as to plaintiffs' enforcement actions under RCRA and CWA.

**SO ORDERED.**

---

7. The court had noted in its opinion and order denying summary judgment that "at a minimum, there is an issue of material fact as to whether the Piñonas River is navigable or not," *Marrero Hernandez,* 597 F.Supp.2d 272, 288 (D.P.R.2009), Docket No. 975, 19–20. The court now notes that defendant Esso's arguments seem to be premised on the notion that the Piñonas River falls within the definition of "waters of the United States." Because there does not seem to be a controversy as to this point, and because the court is convinced by the pertinent case law, it finds that the Piñonas River is, in fact, "navigable" and falls within that definition. *See Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers,* 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001) (making clear that waters of the United States include at least some waters that are not navigable in the classic sense, such as non-navigable tributaries and streams); *International Paper Co. v. Ouellette,* 479 U.S. 481, 486 n. 6, 107 S.Ct. 805, 93 L.Ed.2d 883 (upholding the EPA's broad definition of this term as including almost any body of surface water that might affect interstate commerce); *United States v. Rivera Torres,* 826 F.2d 151, 154–55 (citing several cases in support of the assertion that "the CWA has been consistently applied by the courts to land and waters located in Puerto Rico").